Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio




# OPINION

No. 04-09-00603-CV

**PRIZE ENERGY RESOURCES, L.P.**, et al.
Appellants/Cross-Appellees

v.

**CLIFF HOSKINS, INC.**, et al.,
Appellees/Cross-Appellants

From the 343rd Judicial District Court, McMullen County, Texas
Trial Court No. M05-0002-CV-C
Honorable Michael E. Welborn, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Karen Angelini, Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:  February 23, 2011

AFFIRMED IN PART; MODIFIED AND AFFIRMED IN PART; REVERSED AND
RENDERED IN PART; AND REVERSED AND REMANDED IN PART

This appeal arises out of a title dispute over oil and gas producing property in McMullen

County, Texas.  The trial court resolved the issues of title in a summary judgment, rejected the

plaintiffs' bad faith trespass claims against the working interest owners, and after a bench trial

awarded damages for unpaid net revenues and royalties.  The court declined to award attorney's

fees to any party.  Five parties appeal from the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The underlying lawsuit arises out of a title dispute to mineral interests in a 690.54-acre tract known as the Baker Property, which comprises Section 3, Seale & Morris Survey A-434, in McMullen County, Texas. In 2001, the period of time relevant to this appeal, there were four owners of the mineral estate in the Baker Property:

- Burlington Resources, which owned a 25% mineral interest acquired from El Paso Natural Gas Company which had entered into a written lease with P.R. Rutherford in 1966 known as the "El Paso Lease," which was still in effect in early 2001.

- The Baker Trusts,[1] represented by Bank of America (the "Bank") as trustee, which owned a 25% mineral interest and through Earl M. Baker had entered into a written lease with P.R. Rutherford in 1965 known as the "Baker Lease," which was still in effect in early 2001.

- Michael G. Rutherford and Patrick R. Rutherford, Jr., and their children, who are the heirs of P.R. Rutherford, and Rutherford Oil Corporation (collectively, "the Rutherfords"), who owned a 25% mineral interest subject to the Baker Lease.

- BP America Production Company ("BP"), successor to Atlantic Richfield Company ("ARCO"), which owned a 25% mineral interest that was not subject to a written lease.

A joint operating agreement ("JOA") covered the Baker Property (the "Unit Area"). The JOA was entered into in 1967 between ARCO, as a 25% mineral interest owner and the operator, and P.R. Rutherford, W. Earl Rowe, T.J. Goad, Patrick Rutherford, Jr., and Michael C.

---

[1] The beneficiaries of the "Baker Trusts" are the heirs of Earl M. Baker. The "Baker Trusts" include the Bettye Baker Brown Trust, u/w, f/b/o William David Deiss, the Bettye Baker Brown Trust, u/w, f/b/o Diane Elizabeth Mysliwiec, the Bettye Baker Brown Trust, u/w, f/b/o Paula Jane Roberts, and the Bettye Baker Brown Trust, u/w, f/b/o Dorothy Baker Shaw 1966 Trust.

Rutherford (the "P.R. Rutherford Group") as the owners of the leasehold interests. The P.R. Rutherford Group contributed the El Paso and Baker Leases (jointly, the "Leases"), covering 75% of the mineral interests in the Baker Property, to the JOA. ARCO's 25% mineral interest was not subject to a written lease, but was contributed to the JOA so that the Baker Property could be developed as a whole. The mechanism for this was Article 3 of the JOA, which created a "deemed lease"[2] covering any unleased mineral interest that had been contributed to the Unit Area—i.e., ARCO's unleased 25% mineral interest. Therefore, from 1967 forward, 100% of the mineral interest in the Baker Property was subject to the JOA, with ARCO serving as the operator of all drilling operations and production in the Unit Area. As a mineral owner, ARCO was entitled to receive 25% of the 1/8 royalty under the JOA, and retained a possibility of reverter[3] of its mineral interest if the JOA ever terminated. After the JOA was signed, two successful wells were drilled on the Baker Property (Baker Well Nos. 4 and 6).

The El Paso and Baker Leases each contained a "continuous production or operations" clause providing for continuation of the lease after the expiration of its primary term for as long as operations or production was on-going. The clauses were substantially the same, and provided that the lease would "remain in force so long as drilling, mining or reworking operations are prosecuted (whether on the same or different wells) with no cessation of more than sixty (60) consecutive days, and if they result in production, so long thereafter as oil or gas is produced from said land or land pooled therewith." With respect to the term of the JOA,

---

[2] Article 3 of the JOA provides in relevant part, "If it develops that any interest owned and contributed by a party hereto is an unleased interest in the oil and gas rights, then such unleased interest shall be treated for all purposes of this agreement as if it were an oil and gas lease covering such unleased interest on a form providing for the usual and customary one-eighth royalty . . . ." The parties refer to this provision as the "deemed lease," so we will use that term as well.

[3] A possibility of reverter is the future interest in a determinable fee grant that the mineral owner retains after executing an oil and gas lease. *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991); *Bagby v. Bredthauer*, 627 S.W.2d 190, 197 (Tex. App.—Austin 1981, no writ) (possibility of reverter is a vested non-possessory interest in real estate which can be assigned, transferred or sold in whole or part).

Article 10 provided that the JOA "shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise . . . ."

In 1986, ARCO entered into a purchase and sale agreement with Prize Energy ("Prize"), known at that time as Petrus Energy, pursuant to which it sold all its rights under the JOA. Under the terms of the agreement, ARCO retained its royalty interest and its right of reverter to its 25% mineral interest subject to the JOA's "deemed lease," which mineral interest would revert back to ARCO free and clear if the JOA ever terminated. After the 1986 sale, Prize and the P.R. Rutherford Group were the operators under the JOA on the Baker Property from 1986 forward.

During June–August 2001, there was a 71-day period when no well on the Baker Property was operating or producing in paying quantities.[4] None of the lessors were aware of the cessation of operations, and no one raised any concern at the time. In the following years, Prize (through Cimarex Energy), and then Gruy Petroleum/Rutherford Oil,[5] continued developing the Baker Property and drilled and completed seven more wells, the Baker Well Nos. 7-13; four of those wells were producing wells.

In 2004, Cliff Hoskins, who had no previous connection to the Baker Property, conducted some research on leases in the area, and became aware of the possible termination of the Baker Property's Leases and the JOA in August 2001. Hoskins, through his company Cliff Hoskins, Inc. ("Hoskins"), contacted BP (f/k/a ARCO), and offered to buy its 25% mineral interest which

---

[4] At trial, Prize and the Rutherfords argued that flaring on one of the Baker wells conducted in June 2001 was sufficient to constitute "operations," but the trial court disagreed, and this particular finding has not been appealed; therefore, we must accept as true that there was no production or operations on the Baker Property for 71 continuous days.

[5] In April 2002, Gruy Petroleum Management Co. succeeded Prize as the operator on the Baker Property, with Rutherford Oil Corporation acting as the operator for some of the wells, including Baker Well No. 11.

Hoskins asserted had reverted to BP in August 2001—when the JOA had purportedly terminated due to the cessation of operations. On June 25, 2004, BP sent a letter to Magnum Hunter Resources, Inc.[6] questioning whether production on the Baker Property had ceased between June 2001 and April 2002, and requesting documents to confirm production—including meter readings, allocation statements, and check details relating to payments for gas produced. Magnum Hunter responded that, "[t]here has been continuous production, under the terms of the leases and the operating agreement . . .," and provided none of the requested documents.

Hoskins filed suit to quiet title on January 25, 2005.[7] One month later, in February 2005, the Rutherfords, the Bank, and Burlington all signed ratifications of the El Paso and Baker Leases (the "Ratifications"), which purported to extend or renew the Leases that made up 75% of the interests subject to the JOA; the other 25% was made up of ARCO/BP's unleased interest which was contributed to the JOA. BP subsequently filed its own suit against Prize and the Rutherfords in October 2005. In 2007, BP deeded its claimed (reverted) 25% mineral interest to Hoskins, making the transfer retroactive to August 16, 2004. In the sale to Hoskins, BP reserved a 6.25% nonparticipating royalty interest in the 25% mineral interest it conveyed to Hoskins.

In their suits against Prize and the Rutherfords, Hoskins and BP asserted claims to quiet title to their interests and for declaratory relief, plus claims for bad faith trespass, theft/conversion, recovery of unpaid proceeds under the Texas Natural Resources Code, breach of contract, and recovery of attorney's fees. The Bank, as trustee for the Baker Trusts, also asserted various claims against Prize and the Rutherfords, including claims for fraud, trespass, and theft, rescission of its Ratification, and to quiet title to the Baker Trusts' mineral interest.

---

[6] The June 25, 2004 letter identifies Magnum Hunter Resources, Inc. as a successor operator to Prize under the JOA.

[7] Hoskins claimed standing based on a retroactive transfer of BP's 25% mineral interest to Hoskins.

Competing summary judgment motions were filed by all the parties. On February 5, 2009, the trial court signed an "Interlocutory Judgment" in which it:

1. Granted the summary judgment motion by Prize and the Rutherfords on "all Plaintiffs' claims of trespass," and ordered that Plaintiffs "take nothing . . . on any trespass claim in this cause;"

2. Granted the summary judgment motion by Prize and the Rutherfords on all claims by the Bank, "including claims of fraud and rescission of the Ratification," and ordered that the Bank take nothing;

3. Granted the declaratory relief sought by Hoskins and BP, finding (i) the El Paso and Baker Leases and the JOA all terminated in August 2001, at which time Hoskins/BP's mineral rights and interests reverted free and clear from the JOA, making them unleased co-tenants; (2) from August 2001 through August 15, 2004, BP had an undivided 25% mineral interest, subject only to the non-participating royalty interest; and (3) from August 16, 2004 forward, BP's 25% mineral interest passed to Hoskins, subject to BP's retained royalty interest which burdens Hoskins' mineral interest and "does not burden any interests held by the Defendants;"

4. Made the finding that "the Defendants as mineral owners or invitees of mineral owners were not trespassers, or were alternatively 'good faith trespassers,'" as to Hoskins and BP after termination of the Leases and JOA;

5. Granted summary judgment "against all remaining claims and counterclaims asserted by any party in this case;"

6. Granted summary judgment "against all remaining affirmative defenses asserted by any party to the extent those defenses would be inconsistent with the Court's rulings;"

7. Ordered the parties to work together to stipulate to "the revenues less costs applicable to the Subject Acreage," or a bench trial on "that remaining issue" would be conducted; and

8. Noted the parties "dispute whether the issues of attorney's fees and interest, including such claims under the Texas Natural Resources Code, are still live issues," and stated the Court would determine those issues by further order or in the final judgment, and that it had indicated it would "decline to award any discretionary attorneys' fees to any party in this case."

The parties were unable to stipulate to the net revenues, so a bench trial was held on that issue. On September 11, 2009, the trial court signed its final judgment which incorporated its

interlocutory judgment "addressing the liability issues in this case," and then awarded damages for net revenues to Hoskins of $1,267,482, plus pre-judgment and post-judgment interest, and damages for net revenues and royalty revenues to BP of $3,252,827, plus pre-judgment and post-judgment interest. The court found the "underlying nature of Hoskins' and BP's suit was to obtain a determination of title," and declined to award attorney's fees to any party. The court made an alternative finding, however, that each party had incurred reasonable attorney's fees of $900,000 each. All parties appealed from the judgment.[8]

In the main appeal, appellants Prize[9] and the Rutherfords are aligned,[10] and appellees Hoskins and BP are aligned. Each aligned party adopts the other party's brief. In their appeal, Prize and the Rutherfords present the following arguments: (1) as a matter of law, the JOA did not terminate and BP's 25% mineral interest did not revert; (2) alternatively, the net revenues damages awarded to Hoskins and BP should be reversed because there is no cause of action to support the damages award; (3) the royalties awarded to BP should be reversed because Prize's and the Rutherfords' interests are not burdened by BP's royalty interest; (4) the pre-judgment and post-judgment interest awards to Hoskins and BP should be reversed; (5) the court should have awarded Prize and the Rutherfords their attorney's fees because they prevailed on their summary judgment motions; (6) the court erred in imposing a future duty of accounting on Prize and the Rutherfords; and (7) as a conditional point in the event of a remand on BP's contractual claim for royalties, the affirmative defenses raised by Prize and the Rutherfords are still live. The Rutherfords also raise two additional damages-related issues in the event this Court sustains

---

[8] Burlington Resources settled and is not involved in the appeal.

[9] The "Prize" appellants/defendants are Prize Energy Resources, L.P., Prize Operating Company, Gruy Petroleum Management Company n/k/a Cimarex Energy Co. of Colorado, Magnum Hunter Resources, Inc., Cimarex Energy Co., and Hunter Gas Gathering, Inc.

[10] In their appellants' brief, the Rutherfords state they are fully aligned with Prize on all issues and adopt the arguments presented in the Prize appellants' brief.

the damages awards to Hoskins and BP: (1) the court erred in assessing damages against the "Rutherford Children" who own only leasehold interests and no mineral interests; and (2) the court erred in making the Rutherfords jointly and severally liable with Prize for the total damages awarded to Hoskins and BP.

## TITLE QUESTION

As noted, *supra*, the trial court granted declaratory relief to Hoskins and BP on the question of their title to the 25% unleased mineral interest. Specifically, the court held that, in August 2001, the El Paso and Baker Leases and the JOA terminated, and BP's 25% mineral interest reverted to it free and clear of the JOA; therefore, from August 2001 through August 15, 2004, BP had clear fee simple title to its undivided 25% mineral interest. On August 16, 2004, Hoskins acquired title to such 25% mineral interest from BP, subject only to BP's retention of a 6.25% nonparticipating royalty interest. In their appeal, Prize and the Rutherfords assert the judgment in favor of Hoskins and BP on their title claims should be reversed and rendered because, as a matter of law, the JOA never terminated; therefore, there was no reversion to BP of the 25% mineral interest contributed to the JOA, and BP could not sell the 25% mineral interest to Hoskins. Thus, Hoskins owns no interest in the Baker Property. Under Prize's and the Rutherfords' theory, BP still holds only the reversionary right to the 25% mineral interest plus the right to receive royalties.

In support of their position, Prize and the Rutherfords make the following arguments: (1) as an initial matter, BP and Hoskins have no standing to assert that the JOA terminated because they are not parties to the operating agreement; (2) the JOA never terminated because it was continued or revived by the Ratifications of the El Paso and Baker Leases signed by Burlington, the Rutherfords, and the Bank; (3) the JOA never terminated because it was extended by the

conduct of the parties to the agreement, i.e., Prize and the Rutherfords continued to operate under the JOA; and (4) even if the Leases and JOA terminated due to the cessation of production/operations, the "deemed lease" created by Article 3 of the JOA did not terminate because it contains no "cessation of production" clause.

In response, Hoskins and BP assert that the Baker and El Paso Leases terminated upon the 71-day cessation of production in August 2001, and, according to its own terms, the JOA automatically terminated at that time as well. Upon termination of the JOA in August 2001, BP's 25% mineral interest contributed to the JOA was released from the "deemed lease," and immediately and automatically reverted to BP free and clear of the JOA. Thus, BP had clear title to its 25% mineral interest which it subsequently sold to Hoskins, retaining only a 6.25% nonparticipating royalty interest. In responding to the issues raised by Prize and the Rutherfords, Hoskins and BP argue: (1) they have standing to assert the JOA terminated because its termination directly affects their ownership interests; (2) Prize and the Rutherfords did not appeal the trial court's finding that the Leases terminated in August 2001 due to the cessation of operations/production, and, based on that finding, the JOA automatically terminated in August 2001 according to its own terms and the reversion to BP occurred; (3) the JOA was not continued, renewed, or revived by (i) the Ratifications signed in 2005 by the three lessors on the written Leases, (ii) the conduct of the operators in continuing to drill under the JOA after August 2001, or (iii) the "deemed lease" provision of the JOA. As these issues are intertwined, we will discuss them together.

**(1) Standing.** The threshold issue we must resolve is whether BP and Hoskins have standing to sue to declare the JOA terminated and to clear their title to the 25% mineral interest which BP sold to Hoskins. As Hoskins' ownership interest flows from, and is dependent on,

BP's ownership interest, we will initially focus on BP. Resolution of the question of standing is intertwined with the title question of whether BP's mineral interest reverted back to it in August 2001 so that it could later be sold to Hoskins.

Standing is a component of subject matter jurisdiction and must be resolved first before the merits of an issue may be addressed. *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) (noting a court lacks jurisdiction over a claim made by a plaintiff without standing to assert it). To have standing, a plaintiff must be "personally aggrieved" and his injury must be "concrete and particularized, actual or imminent, not hypothetical." *Id.* at 304-05. Standing cannot be waived and may be raised for the first time on appeal. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). A party's standing is determined at the time suit is filed. *Id.* at 446 n.9; *In re Guardianship of Archer*, 203 S.W.3d 16, 23 (Tex. App.—San Antonio 2006, pet. denied). In determining standing, we look to the facts alleged in the petition, but may consider other evidence in the record if necessary to resolve the question of standing. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

Prize and the Rutherfords assert that neither BP nor Hoskins has standing to assert the JOA terminated because (i) neither is a party to the JOA, and (ii) neither is a third party beneficiary of the JOA. BP and Hoskins respond that they have standing because BP is the successor to ARCO, an original signing party to the JOA, who retained a contractual interest in the JOA after the 1986 sale because its unleased 25% mineral interest was "contractually committed" to the JOA under Article 3; therefore, the reversionary interest retained by ARCO/BP was directly tied to, and wholly dependent on, the termination of the JOA, giving BP standing to sue to declare the JOA terminated.

First, it is undisputed that neither BP nor Hoskins is a signing party to the JOA.  The JOA was executed in 1967 by the P.R. Rutherford Group as the operator and lessee under the Baker and El Paso Leases, and by ARCO as the operator and a mineral owner contributing its unleased 25% mineral interest to the Unit Area.  ARCO retained a reversionary interest pursuant to which its 25% mineral interest would revert back to ARCO if the JOA ever terminated; in addition, it contracted for a royalty interest under the JOA, although while it was the operator ARCO never paid itself any royalties.  In 1986, when ARCO sold all of its rights and obligations under the JOA to Petrus (predecessor of Prize), ARCO retained its right of reverter to its 25% mineral interest upon termination of the JOA and its royalty interest.  Petrus/Prize succeeded to ARCO's 50% working interest and became co-operator along with the P.R. Rutherford Group from 1986 forward.  BP succeeded to the rights ARCO retained in the 1986 sale, i.e., the reversionary interest and the royalty interest.

Prize and the Rutherfords assert that because ARCO sold all its rights under the JOA in 1986, and BP succeeded only to the royalty and reversionary interests retained by ARCO, BP has no standing to challenge the JOA because it is not a party to the JOA, and is not a third party beneficiary of the JOA; alternatively, at most, BP is only an incidental beneficiary who may not bring an action on the JOA.  We agree that, under well-settled contract principles, only the parties to a contract have the right to complain of a breach of the contract, with the exception that a nonparty who proves the contract was made for his benefit, and that the contracting parties intended he benefit from the contract, may bring an action on the contract as a third party beneficiary. *See Grinnell v. Munson*, 137 S.W.3d 706, 712 (Tex. App.—San Antonio 2004, no pet.); *Tennessee Gas Pipeline Co. v. Lenape Resources Corp.*, 870 S.W.2d 286, 295 (Tex. App.—San Antonio 1993), *aff'd in part and rev'd in part on other grounds*, 925 S.W.2d 565

(Tex. 1996); *Bruner v. Exxon Co.*, 752 S.W.2d 679, 682-83 (Tex. App.—Dallas 1988, writ denied). In contrast to a donee or creditor beneficiary, an "incidental beneficiary" who may receive only an incidental benefit from the performance of the contract, does not have a right of action on the contract. *MCI Telecomm. Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999); *see Grinnell*, 137 S.W.3d at 712-14 (surface estate owner, who as shareholder of corporate mineral owner had indirect right to receive share of royalties when paid under oil and gas leases, was merely an incidental beneficiary who did not have standing to sue to declare leases terminated; he was not a party to leases and leases were not intended to benefit surface owner); *see also Bruner*, 752 S.W.2d at 682-83 (party with assignment of rentals was merely incidental beneficiary of lease, and had no standing to sue for wrongful termination of oil and gas lease).

Here, however, the critical factor is that BP is claiming an ownership interest by virtue of the reversion of its mineral interest. An oil and gas lease generally conveys a fee simple determinable in the mineral estate with the possibility of reverter. *Natural Gas Pipeline Co. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003) (lessee acquires ownership of all the minerals in place that lessor owned and leased, subject to possibility of reverter in the lessor); *Concord Oil Co. v. Pennzoil Exploration and Prod. Co.*, 966 S.W.2d 451, 460 (Tex. 1998) (lessor also receives the rights bargained for under the lease, typically the payment of royalties, delay rentals and bonuses). A "'possibility of reverter' is the real property term of art for what the grantor owns as a future interest in a determinable fee grant; it is the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs." *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991); *Stephens County v. Mid-Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S.W. 290, 295 (1923) (typical oil and gas lease actually conveys the mineral estate

as a determinable fee, less those parts reserved). Here, as successor to ARCO and the rights it reserved in the 1986 sale, BP held a right of reversion to a 25% interest in the mineral estate; in other words, BP held a right to fee simple ownership in the minerals which would revert to it upon occurrence of a specific condition–the termination of the JOA. As the holder of a reversionary interest, BP had standing to bring a title claim to assert its ownership rights in the mineral estate. *Cf. Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 10-11 (Tex. 2008) (holding lessor's non-possessory reversion interest in the leased minerals gave him standing to sue for trespass based on wrongful drainage, although he was required to prove actual injury to recover damages for trespass against a non-possessory interest). Once the reversion was triggered by termination of the JOA in August 2001, as discussed in detail below, BP held a fee simple 25% interest in the mineral estate and had standing to sue to declare the JOA terminated, and to clear its title. Hoskins, in turn, has standing because it acquired BP's mineral interest after the reversion. Accordingly, we reject Prize's and the Rutherfords' contention that BP and Hoskins lack standing to bring this lawsuit.

(2) **Title Determination.** Having determined that BP and Hoskins have standing to bring the underlying lawsuit, we turn to the trial court's determination of the title question. The trial court made a finding that operations on the Baker Property ceased for more than sixty consecutive days in June–August 2001, and that finding is not challenged on appeal; therefore, we must accept that fact as the starting point for our analysis.

Termination of an oil and gas lease is a contractual matter. *Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 424 (Tex. 2008); *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (oil and gas lease is a contract and its terms are interpreted as such). In construing an unambiguous oil and gas lease, we seek to enforce the parties' intent as expressed within the

four corners of the lease document. *Tittizer*, 171 S.W.3d at 860; *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). We construe the lease as a whole, attempting to harmonize all its parts, and attribute to the lease's language its plain, grammatical meaning unless it would undermine the parties' intent. *Anadarko*, 94 S.W.3d at 554. A typical Texas mineral lease contains an habendum clause that defines the duration of the lease, typically providing a relatively short fixed term of years as the primary term and then a secondary term for "as long thereafter as oil, gas or other mineral is produced." *Id.*; *Grinnell*, 137 S.W.3d at 714. A lease that states its secondary term lasts for "as long as oil or gas is produced" automatically terminates if actual production ceases other than temporarily. *Anadarko*, 94 S.W.3d at 554; *Amoco Prod. Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex. 1978).

Here, the Baker and El Paso Leases expressly provided for a fixed primary term, and upon its expiration for a secondary term during which

> the lease shall remain in force so long as operations on said well or for drilling or reworking of any additional well are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith.[11]

Therefore, the life of the secondary term of the Leases was dependent on the continuation of operations with no interruption of more than sixty consecutive days. Upon the undisputed cessation of operations for more than sixty consecutive days in June–August 2001, both the Baker and El Paso Leases automatically terminated according to their express language, without the need for any legal action by the lessors. *See Anadarko*, 94 S.W.3d at 554; *Braslau*, 561 S.W.2d at 808; *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 30 (1929); *see also BP Am. Prod. Co. v. Marshall*, 288 S.W.3d 430, 451 (Tex. App.—San Antonio 2008, pet. granted); *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 164-65 (Tex. Civ. App.—San

---

[11] The quoted language is from the Baker Lease; the El Paso Lease contains substantially the same provision.

Antonio 1955, writ ref'd n.r.e.) (under terms of particular lease, parties stipulated that a cessation of production for more than sixty consecutive days was not "temporary," and if re-working or additional operations did not begin during the 60-day period the lease would terminate by its own terms; therefore, lessees were not entitled to reasonable time to remedy problem and resume production).

Termination of the Leases in August 2001 in turn triggered the automatic termination of the JOA according to its own contractual language. Article 10 of the JOA expressly provided that the agreement "shall remain in full force and effect for as long as any of the oil and gas leases subjected to this agreement remain or are continued in force as to any part of the Unit Area, whether by production, extension, renewal or otherwise." The language of Article 10 clearly makes the term of the JOA dependent on the continuation of the "leases subjected to this agreement;" it is undisputed that the Baker and El Paso Leases were the only leases that were contributed to the JOA. When the Baker and El Paso Leases terminated due to the more than sixty-day cessation of operations, the JOA automatically terminated according to the express language of Article 10. *Wagner & Brown*, 282 S.W.3d at 424; *Anadarko*, 94 S.W.3d at 554.

Upon termination of the Leases and JOA, the mineral interests immediately and automatically reverted back to the mineral owners, without the need for any action; the unleased 25% mineral interest contributed by BP's predecessor ARCO immediately reverted to BP, free and clear of the JOA. *See Sigler Oil*, 19 S.W.2d at 30 (if a lease terminates, the fee interest reverts to the lessor without the lessor taking any legal action); *see also Marshall*, 288 S.W.3d at 451 ("If the lease's primary term expires when there is non-production and the lessee fails to comply with any savings clause in the lease, the lease and the lessee's determinable fee interest 'automatically terminates' . . . and the fee interest reverts to the lessor without the lessor taking

any legal action."). At that point, in August 2001, upon the termination of the JOA and the concurrent reversion to BP, BP became an unleased co-tenant in the Baker Property. *Marshall*, 288 S.W.3d at 460; *Ladd Petroleum Corp. v. Eagle Oil and Gas Co.*, 695 S.W.2d 99, 110-11 (Tex. App.—Fort Worth 1985, writ ref'd n.r.e.) (if leases terminated, lessee would be considered a co-tenant of the leasehold estate with right to enter tract and take into account its costs in calculating damages owed to lessors) (citing *Cox v. Davison*, 397 S.W.2d 200, 203 (Tex. 1965)). Hoskins' co-tenant rights in the Baker Property likewise hinge on the termination of the JOA, and the ensuing reversion to BP of its 25% mineral interest contributed to the JOA—which mineral interest BP then sold to Hoskins.

Prize and the Rutherfords argue that the JOA never terminated because the Ratifications of the Baker and El Paso Leases signed by the Rutherfords, Burlington, and the Bank in February 2005 either continued or renewed the JOA under Article 10.[12] We disagree. While the Rutherfords, Burlington, and the Bank[13] may be able to effectively "extend" or "renew" the written Leases to which they are parties by executing a new lease through a "ratification" document signed after termination of the Leases, they may not bind a non-party's interest such as BP's interest, or strip away the mineral interest that automatically reverted to BP years before the Ratifications. *See Gasperson v. Christie, Mitchell & Mitchell Co.*, 418 S.W.2d 345, 350 (Tex. Civ. App.—Fort Worth 1967, writ ref'd n.r.e.) ("If the former lease had actually expired according to its terms, any new lease(s) taken would not be 'in renewal and/or extension' except by contract of the parties to the new lease(s) . . . even if the contract so provided it would only be

---

[12] The Ratifications contain language stipulating that the Baker and El Paso Leases have "been continuously perpetuated since [their date of execution] by either (i) the production of oil and/or gas in paying quantities or (ii) operations, or both." In addition, in the Ratifications the lessor "ratifies and adopts" the Lease and executes a new lease.

[13] We note that the Bank is appealing the granting of summary judgment in favor of Prize and the Rutherfords on the issue of whether its Ratification is valid. This argument will be addressed later in the opinion.

binding upon parties in privity to the new contract."); *see also Willson v. Superior Oil Co.*, 274 S.W.2d 947, 950 (Tex. Civ. App.—Texarkana 1954, writ ref'd n.r.e.) ("An oil and gas lease executed by one co-tenant is valid as between the parties, but ineffectual as to the co-tenant of the grantor."). Each owner in a co-tenancy acts for himself, and has no authority to bind others merely because of the co-tenancy relationship. *Willson*, 274 S.W.2d at 950.

Even the JOA recognizes that any unleased mineral interest must be affirmatively "contributed" to the Unit Area in order for the "deemed lease" provision of Article 3 to apply.[14] There is no evidence that, at any time after August 2001, BP or Hoskins ever contributed the reverted 25% mineral interest to the Unit; indeed, both have strongly argued the opposite. Furthermore, we reject Prize's and the Rutherfords' argument that the "deemed lease" provision in Article 3 of the JOA, by itself, was enough to prevent the JOA from terminating when the JOA's duration was expressly made dependent on the continuation and existence of the underlying written Leases.

We similarly reject the argument made by Prize and the Rutherfords that the JOA was extended by their conduct in treating the JOA as on-going, or, alternatively, that their conduct in continuing to develop the Baker Property created an implied joint operating agreement. This is a species of the same argument we rejected above. The argument ignores the fact that the mineral interests immediately reverted to the lessors/owners upon the cessation of production, and termination of the Leases and JOA, in August 2001. Even if Prize and the Rutherfords created an implied contract between themselves through their actions subsequent to August 2001, their actions could not recapture the mineral interests that immediately reverted upon termination of the Leases and JOA. *See Sigler Oil*, 19 S.W.2d at 30; *see also Marshall*, 288 S.W.3d at 451.

---

[14] Article 3 applies to "any interest owned and <u>contributed</u> by a party hereto." (emphasis added).

In conclusion, according to the written documents' unambiguous terms, the Leases automatically terminated upon the more than sixty-day cessation of operations in August 2001, causing the JOA to simultaneously terminate and BP's 25% mineral interest contributed to the JOA to revert back to BP free and clear. Accordingly, we hold the trial court correctly resolved the question of title, holding in relevant part that, "from August 2001 forward, the interests owned by Hoskins and BP in and to the Baker Ranch property . . . are as follows: (1) from August 2001 through August 15, 2004, BP had an undivided 25% mineral interest, subject only to a 1/64th non-participating royalty interest burden (herein the 'BP 25% mineral interest'); and (2) from August 16, 2004 forward, the 'BP 25% mineral interest' passed to Hoskins, subject to BP retaining an undivided .06250 of 8/8ths royalty interest, which burdens the 'BP 25% mineral interest' now owned by Hoskins." Therefore, we overrule Prize's and the Rutherfords' Issue No. 3 concerning title. Having resolved the issues of standing and title, we next address Hoskins' allegation of bad faith trespass against Prize and the Rutherfords.

## TRESPASS

The parties contested whether Prize and the Rutherfords were bad faith trespassers because they continued to operate on the Baker Property after the cessation of operations in August 2001, and, in fact, drilled and completed Baker Well Nos. 7 through 13 after termination of the Leases and the JOA, and over BP's protest. Hoskins, BP, and the Bank moved for summary judgment declaring that the Leases and JOA terminated in August 2001 and to clear title to their respective interests. Prize moved for summary judgment, arguing: (1) that the JOA had never terminated because of "production, extension, renewal, or otherwise;" (2) that Prize and the Rutherfords had the right to drill and operate on the Baker Property because they were co-tenants, or had the consent of a co-tenant; and (3) that Prize and the Rutherfords had

adversely possessed any interest allegedly reserved by BP or its predecessor. As we have previously discussed, the trial court granted Hoskins' and BP's request for declaratory relief on the title issues. As part of the declaratory relief granted on summary judgment, and re-stated in the final judgment, the court made a finding that Prize and the Rutherfords "as mineral owners or invitees of mineral owners were not trespassers, or alternatively, were 'good faith trespassers,' immediately after termination of the Leases and the 1967 JOA in August 2001 and at all times thereafter." Furthermore, the court ordered that the plaintiffs "take nothing . . . on any trespass claim in this cause."

On cross-appeal, Hoskins and the Bank[15] assert the trial court erred in granting summary judgment against them on their trespass claims because the record shows that Prize and the Rutherfords committed bad faith trespass as a matter of law, and that all their affirmative defenses fail.[16]

**(1) Standard of Review.** We review both a no-evidence and a traditional motion for summary judgment *de novo*. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). We will uphold a traditional summary judgment only if the movant has established that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law on a ground expressly set forth in the motion. TEX. R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). A traditional motion for summary judgment is properly granted if the defendant disproves at least one essential element of the plaintiff's cause of action, or establishes all

---

[15] The Bank adopts Hoskins' arguments on this issue.

[16] BP agrees with the trial court's finding that Prize and the Rutherfords were, at most, good faith trespassers, and is not appealing this finding.

essential elements of an affirmative defense.  *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002); *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997).  If the movant is successful in establishing its right to judgment as a matter of law, the burden then shifts to the non-movant to produce evidence raising a genuine issue of material fact.  *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979).  In deciding whether the summary judgment record establishes the absence of a disputed material fact, we view as true all evidence favorable to the non-movant and indulge every reasonable inference in favor of the non-movant.  *Nixon*, 690 S.W.2d at 548-49.

When reviewing a no-evidence motion for summary judgment, we review the evidence in the light most favorable to the respondent against whom the no-evidence summary judgment was rendered, disregarding all contrary evidence and inferences.  *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *Reynosa v. Huff*, 21 S.W.3d 510, 512 (Tex. App.—San Antonio 2000, no pet.).  If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted.  TEX. R. CIV. P. 166a(i); *Reynosa*, 21 S.W.3d at 512.  More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions," while less than a scintilla exists when the evidence is "so weak as to do no more than create mere surmise or suspicion."  *Reynosa*, 21 S.W.3d at 512 (internal citations omitted).

Where both parties file competing motions for summary judgment, and one is granted and one is denied, we review the record and consider all questions presented and render the decision the trial court should have rendered.  *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex.

2001). If a movant does not establish its entitlement to summary judgment as a matter of law, we must remand the case to the trial court. *Gibbs v. Gen. Motors Corp.*, 450 S.W.2d 827, 829 (Tex. 1970). When summary judgment is sought on multiple grounds and the trial court's order does not indicate the basis for its ruling, we will affirm the summary judgment if any theory advanced by the movant is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *Villanueva v. Gonzalez*, 123 S.W.3d 461, 464 (Tex. App.—San Antonio 2003, no pet.).

**(2)  Analysis.**   Hoskins argues the summary judgment record establishes bad faith trespass as a matter of law. *See Mayfield v. de Benavides*, 693 S.W.2d 500, 504-05 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.); *see also Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex. App.—Fort Worth 2006, pet. denied) (to recover damages for trespass to real property, plaintiff must prove (1) ownership or lawful right to possess real property, (2) defendant made a physical, intentional and voluntary entry onto plaintiff's land, and (3) defendant's trespass caused injury to plaintiff). In the circumstances presented by this appeal, a bad faith trespasser is a lessee who continues to enter under an oil and gas lease after its termination without a good faith belief in the existence of the lease. *Marshall*, 288 S.W.3d at 455; *Mayfield*, 693 S.W.2d at 504-06; *see also Gulf Production Co. v. Spear*, 125 Tex. 530, 84 S.W.2d 452, 457 (1935) ("to act in good faith in developing a tract of land for oil or gas, one must have both an honest and a reasonable belief in the superiority of his title"). Hoskins points to the summary judgment evidence that: (i) the Leases and the JOA terminated in August 2001, causing the lessors' mineral interests to revert back to them; (ii) after August 2001, Prize and the Rutherfords drilled seven additional wells on the Baker Property; and (iii) failed to pay Hoskins its share of the net value of the minerals produced, thereby causing it harm. Hoskins contends, and we agree, that because the summary judgment record establishes all the elements of trespass, the burden shifted to Prize and

the Rutherfords to prove justification for their trespass, i.e., a good faith belief in their right to enter and drill, in order to avoid a finding of bad faith. *See Mayfield*, 693 S.W.2d at 504-05; *see also Cain v. Rust Indus. Cleaning Serv., Inc.*, 969 S.W.2d 464, 470 (Tex. App.—Texarkana 1998, pet. denied) (once plaintiff proves right of ownership of real property and unauthorized entry by defendant, burden of proof shifts to defendant to plead and prove consent or license as justification for entry).

As one of their affirmative defenses, Prize and the Rutherfords asserted their entry after August 2001 was justified under the law of co-tenancy which provides that a co-tenant has a right to explore, drill, and produce minerals from the common estate without consent from any other cotenant. *Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex. 1986); *Cox*, 397 S.W.2d at 201 (each co-tenant has right to enter common estate and corollary right of possession). It is a well-established principle in Texas that a co-tenant has the right to extract minerals from common property without obtaining consent from the other co-tenants, subject only to a duty to account to them for the value of any minerals taken, less the reasonable costs of production and marketing. *Wagner & Brown*, 282 S.W.3d at 426.

We agree with the trial court that Prize and the Rutherfords established that, as a matter of law, they were co-tenants, or invitees of co-tenants, in the Baker Property after the Leases and JOA terminated in August 2001. It is undisputed that, at all times relevant to this case, the Rutherfords held a 25% mineral interest in the Baker Property, in addition to acting as one of the operators on the property. The Rutherfords, along with the Bank, were lessors under the Baker Lease. When that Lease terminated in August 2001 due to the lack of operations, the Rutherfords' mineral interest subject to the Lease reverted back to them. From August 2001 forward, the Rutherfords were therefore co-tenants in the Baker Property along with the other

- 22 -

mineral interest owners—the Bank, Burlington, and BP. *See Marshall*, 288 S.W.3d at 459-60. Prize operated on the Baker Property as a co-operator with the Rutherfords, who were both mineral interest owners and co-operators.

We overrule this issue on cross-appeal and affirm the trial court's summary judgment ruling that, after the JOA's termination in August 2001, Prize and the Rutherfords were not trespassers because they were mineral owners or invitees of mineral owners in the Baker Property.

AWARD OF DAMAGES

Having determined that the JOA terminated in August 2001, and having affirmed the trial court's determination of title, we next turn to the issue of damages. Prize, the Rutherfords, Hoskins, and BP all raise various challenges to the trial court's award of damages to Hoskins and BP. We begin by addressing the arguments raised by Prize and the Rutherfords in the main appeal, then address the issues raised on cross-appeal by Hoskins and BP, and finally address the conditional issues raised separately by the Rutherfords.

## I.    Prize's and the Rutherfords' Challenges to Damages Award

As noted, the trial court awarded Hoskins $1,267,482 as its share of the net revenues from August 16, 2004 to October 31, 2008, and awarded BP $3,252,827 as its share of the net revenues from August 1, 2001 to August 15, 2004 and its royalties from August 16, 2004 to October 31, 2008.[17] The trial court defined "net revenues" as the "gross revenues less reasonable and necessary expenses beneficial to the Subject Acreage and including the Baker Well Nos. 8, 11 and 13." In addition, the court assessed pre-judgment and post-judgment interest on both damages awards, and ordered that Prize and the Rutherfords are jointly and severally liable for both damages awards.

---

[17] As noted, Hoskins' acquisition of BP's 25% mineral interest was made retroactive to August 16, 2004.

In their appeal, Prize and the Rutherfords argue the damages awarded to Hoskins and BP must be reversed, and a take-nothing judgment must be rendered, because (i) Hoskins and BP did not recover under any legal theory that supports an award of damages, and (ii) all of the damages awarded to BP represent royalties, and Prize and the Rutherfords are not liable to BP for any royalties after BP sold its mineral interest to Hoskins. In addition, Prize and the Rutherfords complain the final judgment improperly awards future relief.

**(1)  No Legal Theory to Support Damages.**  In their Issue No. 1, Prize and the Rutherfords assert that Hoskins and BP pled no theory of liability which supports the trial court's award of damages consisting of net revenues and royalties. Prize and the Rutherfords argue that Hoskins and BP are not entitled to an award of damages since they prevailed only on their claims for declaratory relief. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (West 2008). Prize and the Rutherfords rely on cases holding that a party cannot characterize a suit for money damages, such as a contract dispute, as a declaratory judgment action in order to circumvent sovereign immunity or other restrictions. *See, e.g.*, *Seals v. City of Dallas*, 249 S.W.3d 750, 757 (Tex. App.—Dallas 2008, no pet.). They then conclude, without additional authority or argument, that because Hoskins and BP were seeking a declaration of their legal rights and status with respect to the Baker Property, they necessarily had no right to recover any monetary damages.

Here, both Hoskins' and BP's live pleadings included, among others, a claim for declaratory relief and to quiet title to BP's 25% mineral interest which was transferred to Hoskins, and a claim to recover their share of unpaid production proceeds, plus interest, under sections 91.402-.404 of the Texas Natural Resources Code ("TNRC"). TEX. NAT. RES. CODE ANN. §§ 91.402-.404 (West 2001 & Supp. 2010). In its interlocutory summary judgment order,

the court granted the requested declaratory relief quieting the title to the 25% mineral interest held by BP and transferred to Hoskins, and granted summary judgment against BP and Hoskins on their claims for trespass. In paragraph five, the court granted summary judgment against "all remaining claims and counterclaims asserted by any party in this case," and against all remaining affirmative defenses asserted by any party. In paragraph seven, the court stated that counsel for Prize and the Rutherfords and counsel for Hoskins and BP were to "work together to attempt to stipulate to the revenues less costs applicable to the Subject Acreage," and if unable to agree, a bench trial would be held "as to that remaining issue," after which a final judgment would issue. The trial court stated its intent to "issue any damage award on a 'net' basis (revenues less reasonable and necessary expenses)," but requested the parties provide information as to the "gross" basis for the record. Finally, in paragraph 8, the court noted that, "[t]he parties dispute whether the issues of attorneys' fees and interest, including such claims under the Texas Natural Resources Code, are still live issues or have been previously dealt with on summary judgment," and stated it would determine those issues in the final judgment. The court further stated, "In the event that the Court rules that any of the subjects listed in this paragraph 8 are still live and undecided, then those undecided subjects are not covered by paragraph 5 [granting summary judgment against all remaining claims] of this order." Reading the interlocutory judgment as a whole, the court clearly intended that the issue of damages, and the calculation of the proper amount of unpaid "revenues less costs," was still a live issue to be determined by stipulation of the parties or at a bench trial. If, as Prize and the Rutherfords contend, all claims for monetary recovery had been denied by summary judgment, there would have been no need for the trial court to conduct a bench trial to determine the proper amount of damages to be awarded to Hoskins and BP.

In its final judgment rendered after the bench trial on damages, the trial court made no express finding as to the legal theory under which it was awarding the "net revenues" damages to Hoskins and BP (plus "royalty revenues"), but did explain its method of calculating the damages. The court's award of "net revenues" calculated as "gross revenues less reasonable and necessary expenses beneficial to the Subject Acreage" conforms to the TNRC's requirement that a payee is entitled to receive its share of the "proceeds derived from the sale of oil or gas from an oil or gas well." *See* TEX. NAT. RES. CODE ANN. §§ 91.401(1), 91.402(a) (West 2001); *see also Concord Oil*, 966 S.W.2d at 461 (while statute was designed to protect royalty interest owners, it also encompasses working interest owners and operators); *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 209-10 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Moreover, the court's assessment of pre-judgment interest on the damages awards is also consistent with recovery under the TNRC, as section 91.403(a) expressly provides for pre-judgment interest as a penalty for failure to meet the prompt payment requirements of the statute. *See* TEX. NAT. RES. CODE ANN. § 91.403(a). In addition, the record of the bench trial clearly shows that BP's and Hoskins' right to recover their share of the proceeds under the TNRC was a contested issue tried before the court.

Prize and the Rutherfords assert there is "no cause of action" under the TNRC, and characterize it as merely a "prompt payment statute." To the contrary, section 91.404 clearly and expressly provides a payee with a cause of action for nonpayment of its share of mineral proceeds, and/or interest on those proceeds, under the TNRC. *Id*. § 91.404(c) ("A payee has a cause of action for nonpayment of oil or gas proceeds or interest on those proceeds as required in Section 91.402 or 91.403 of this code . . . ."); *see Bright & Co. v. Holbein Family Mineral Trust*, 995 S.W.2d 742, 744 (Tex. App.—San Antonio 1999, pet. denied); *see also Anadarko E&P Co.,*

*LP v. Clear Lake Pines, Inc.*, No. 03-04-00600-CV, 2005 WL 1583506, at *2 (Tex. App.—Austin July 7, 2005, no pet.) (mem. op.). As noted, both Hoskins and BP specifically pled for their share of unpaid production proceeds under the TNRC.

In addition, Prize and the Rutherfords argue they are relieved of any liability under the TNRC based on the absence of a signed division order by BP and Hoskins. We disagree. First, the plain language of section 91.402(c) makes the existence of a signed division order only a precondition for "payment" of a payee's share of oil and gas proceeds, not a precondition to a payor's *liability* to pay oil and gas proceeds. Section 91.402(c)(1) states, "As a condition for the payment of proceeds from the sale of oil and gas production to payee, a payor shall be entitled to receive a signed division order from payee . . . ." TEX. NAT. RES. CODE ANN. § 91.402(c)(1). The purpose of a division order is to provide the procedure for distributing the oil and gas proceeds to the payees "by authorizing and directing to whom and in what proportion to distribute the sale proceeds." *Neel v. Killam Oil Co.*, 88 S.W.3d 334, 341 (Tex. App.—San Antonio 2002, pet. denied), *disapproved of on other grounds by Hausser v. Cuellar*, No. 04-09-00560-CV, 2011 WL 313757 (Tex. App.—San Antonio Feb. 2, 2011, no pet. h.) (en banc); *see also Gavenda v. Strata Energy, Inc.*, 705 S.W.2d 690, 691 (Tex. 1986). In other words, the division order is merely the mechanism for payment to a payee of its share of oil and gas proceeds. Second, the statute places the burden on the payor to submit a division order to the payee for its signature; it is not the royalty owner or mineral interest owner's burden to draft its own division order, sign it, and submit it to the payor. TEX. NAT. RES. CODE ANN. § 91.402(c)(1) (". . . a payor shall be entitled to receive a signed division order from payee . . ."); *see, e.g., Headington Oil*, 287 S.W.3d at 207 (oil company that purchased leases with producing oil and gas wells submitted division orders to the known interest owners for signature).

In the absence of express findings in a bench trial, we presume the trial court impliedly made all findings necessary to support its judgment, and affirm the judgment if it can be upheld on any basis. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83-84 (Tex. 1992); *Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex. 1987) (per curiam). Here, construing the entire texts of the final judgment and summary judgment order (incorporated by reference in the final judgment) as a whole, it is clear the trial court (i) reserved from the summary judgment the recovery by Hoskins and BP of their share of net revenues and royalties attributable to their respective interests as declared by the court, and (ii) in the final judgment awarded damages to Hoskins and BP consisting of "net revenues" and "royalty revenues" under section 91.402(a) of the TNRC after conducting a bench trial to determine the specific amounts. *See Whorton*, 742 S.W.2d at 278 (when a judgment is vague or contradictory, we resolve the conflict or ambiguity, if possible, by construing it as a whole with the goal of harmonizing and giving effect to everything the court has written); *Constance v. Constance*, 544 S.W.2d 659, 660 (Tex. 1976). Accordingly, we overrule Prize's and the Rutherfords' complaint that no legal theory supports the award of damages.

**(2) No Duty to Pay Royalties to BP.** In Issue No. 2, Prize and the Rutherfords argue they have no duty to pay the royalties awarded to BP; they contend it is Hoskins' sole obligation to pay BP its royalties as part of the consideration for Hoskins' purchase of BP's 25% mineral interest. As an initial matter, we note that Prize and the Rutherfords assert that the record contains no evidence of any revenues from production from August 1, 2001 to August 15, 2004; therefore, the full $3.2 million awarded to BP represents royalties due on production from August 16, 2004 to October 31, 2008 which should be paid by Hoskins. In support of their contention that they are not responsible for paying BP its post-sale royalties, Prize and the

Rutherfords point to the trial court's statement in the final judgment that "BP's royalty does not **_burden_** any interests held by the Defendants [Prize and the Rutherfords]." (emphasis added). Prize and the Rutherfords interpret that statement to mean they have no obligation as the operators to pay BP its royalties on production. We find their argument to be somewhat disingenuous. First, the court's statement that BP's royalty does not "burden any interests" held by Prize and the Rutherfords is part of the declaratory relief section of the judgment resolving the issues of title among the parties. In the previous sentence describing the interests held by BP, the court explains, "from August 16, 2004 forward, the 'BP 25% mineral interest' passed to Cliff Hoskins, Inc., subject to BP retaining an undivided .06250 of 8/8ths royalty interest, which burdens the 'BP 25% mineral interest' now owned by Cliff Hoskins, Inc." The court was simply clarifying that BP's retained .06250 of 8/8ths royalty interest is attached to, and thus "burdens," the 25% mineral interest now owned by Hoskins.[18] _See Clear Lake Pines_, 2005 WL 1583506, at *3 (an encumbrance is an interest in realty that is a burden on its transfer, and the right to future royalty payments on oil and gas production is an interest in realty) (citing _City of Dayton v. Allred_, 123 Tex. 60, 68 S.W.2d 172, 178 (1934), and _Clyde v. Hamilton_, 414 S.W.2d 434, 438 (Tex. 1967)). The court was not stating that Prize and the Rutherfords have no duty to pay the royalties owed to BP.

Second, as the entities operating on and producing oil and/or gas from the Baker Property, Prize and the Rutherfords, and their successor operators, constitute "payors" under the TNRC, and as such are responsible for distributing the oil and gas proceeds to the "payees," defined as "persons legally entitled to payment from the proceeds derived from the sale of oil or gas," which includes royalty interest owners. TEX. NAT. RES. CODE ANN. § 91.401(1), (2)

---

[18] In the final judgment, the court also noted that the "BP 25% mineral interest" now owned by Hoskins is still subject to the pre-existing 1/64th non-participating royalty originally owned by ARCO.

(defining a "payor" as "the party who undertakes to distribute oil and gas proceeds to the payee, whether as the purchaser of the production of oil or gas . . . or as operator of the well from which such production was obtained or as lessee under the lease on which royalty is due."); *see Concord Oil*, 966 S.W.2d at 461. Thus, part of Prize's and the Rutherfords' obligation as operators on the Baker Property is to pay the royalty owners their royalties on production. TEX. NAT. RES. CODE ANN. § 91.402(a). The fact that the trial court ordered Prize and the Rutherfords to pay the $3.2 million in royalties directly to BP as the royalty owner, rather than to Hoskins as the mineral interest owner, does not constitute an abuse of discretion; in fact, it is consistent with the TNRC. Accordingly, we overrule this issue.

**(3) Future Relief.** In Issue No. 7, Prize and the Rutherfords generally complain that the last substantive paragraph of the final judgment contains improper provisions addressing "future relief that is not pleaded, is advisory and is unwarranted." Texas Rule of Appellate Procedure 38.1 requires an appellant's brief to "contain a clear and concise argument for the contention made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). Prize and the Rutherfords have waived their future relief argument because their briefs fail to make a clear and concise argument, and, with one exception, lack citations to supporting legal authority. The failure by Prize and the Rutherfords to provide a clear argument or supporting authority waives the claimed error. *Nguyen v. Kosnoski*, 93 S.W.3d 186, 188 (Tex. App.—Houston [14th Dist.] 2002, no pet.). Moreover, one of the provisions criticized by Prize and the Rutherfords as binding "people who are not parties to [the judgment], such as unnamed 'first purchasers' or future operators of the property," is consistent with the TNRC definition of a "payor" under section 91.401(2). Prize's and the Rutherfords' seventh issue is therefore overruled.

**II. Hoskins' Challenges to Damages Award**

In its third issue on cross-appeal, Hoskins[19] asserts the trial court erred in rejecting his proposed well by well method of calculating damages, and instead calculating the damages by "lumping all revenue and expenses together for the seven Baker wells drilled post-termination, rather than excluding costs for the three admittedly unprofitable wells." Hoskins also challenges the court's inclusion of the COPAS overhead costs.

**(1) Well by Well Method.** Hoskins contends the court should have calculated the "net revenues" payable to Hoskins and BP on the "well by well" basis presented by its expert. Hoskins argues it should have been awarded $4,508,836 in net revenues (which excludes costs of the three unprofitable wells), rather than the $1,267,482 net revenues actually awarded (which includes deduction of costs of all seven wells).

The trial court expressly rejected the "well by well" method in its final judgment, stating "the Court FINDS that Hoskins' and BP's argument for damages based on a well-by-well basis is not meritorious, and the Court rejects that argument." The court then proceeded to make additional findings that: (i) there is no applicable limitation to Defendants' obligation to account to Hoskins and BP, and therefore no time bar to any of their claims; and (ii) the COPAS production overhead should be allowed as reasonable and necessary costs. In awarding Hoskins unpaid "net revenues," the judgment states the amounts represent "net revenues (i.e., gross revenues less reasonable and necessary expenses beneficial to the Subject Acreage and including Baker Well Nos. 8, 11 and 13) . . . ." Baker Well Nos. 8, 11 and 13 are the unprofitable Baker wells.

To support its well by well approach, Hoskins relies on the court of appeals opinion in *Wagner & Brown, Ltd. v. Sheppard*, 198 S.W.3d 369 (Tex. App.—Texarkana 2006), *rev'd by*

---

[19] BP does not join Hoskins in this point of error.

282 S.W.3d 419 (Tex. 2008), as "the only case on point found by either party directly considering how damages should be calculated when an unleased cotenant drills both profitable and unprofitable wells." That case turned on, as a question of first impression, how a pool of producing oil and gas properties is affected if a lease in the pool expires. *Wagner & Brown*, 282 S.W.3d at 421. Specifically, the case involved an operator seeking to recover reimbursement for a mineral interest owner/unleased co-tenant's share of costs for drilling a gas well before and after the lease on the land had mistakenly expired due to failure to pay the owner's royalties within 120 days of the first gas sales. *Id.* at 421-22. In reversing the Texarkana court, the Supreme Court held in relevant part that: (i) termination of the lease did not terminate the owner's participation in the pooling unit because mineral owners can agree to pool their lands even if no lease exists; and (ii) an operator who drills a well in good faith is entitled to equitable reimbursement of costs, even if the operator's lease is not valid, as long as the operator believed in good faith the lease was valid. *Id.* at 422-23, 426-27. Finally, the Supreme Court confirmed the long-standing rule in Texas that "a cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants; however, he must account to them on the basis of the value of any minerals taken, less the necessary and reasonable costs of production and marketing." *Id.* at 426 (citing *Byrom*, 717 S.W.2d at 605). As to the reason Hoskins relies on the Texarkana opinion, its deduction of expenses on a well by well basis, the Supreme Court expressly noted that it would not reach that issue because it was not raised on review. *See id.* at 425 n.24 (noting the court of appeals "held that the defendants could not deduct expenses incurred on the first well[20] from the revenues for the second well," but defendants did not appeal that conclusion).

---

[20] Evidence before the Texarkana Court of Appeals concerning the first well established that the reworking costs totaled $592,000, but generated only $10,000 in revenue over a two-year period. *Wagner & Brown*, 198 S.W.3d at

To further support its well by well approach, Hoskins asserts the evidence is "uncontroverted" that the Baker Well Nos. 8, 11, and 13 were unprofitable, and thus did not benefit the co-tenancy. Hoskins contends that failure to calculate damages on a well by well basis, *in the absence of a joint operating agreement stating otherwise*, is contrary to well-established Texas law because a co-tenant is not entitled to reimbursement for unsuccessful operations. *See Neeley v. Intercity Mgmt. Corp.*, 732 S.W.2d 644, 646 (Tex. App.—Corpus Christi 1987, no writ) (if co-tenant drills a dry hole, he does so at his own risk and without right to reimbursement for the drilling cost); *see also Burnham v. Hardy Oil Co.*, 147 S.W. 330, 335 (Tex. Civ. App.—San Antonio 1912), *aff'd*, 195 S.W. 1139 (Tex. 1917) (expenses connected with nonproducing wells are not chargeable to other co-tenants but should be borne by those who incurred them).

In response to Hoskins' argument for the well by well calculation, Prize and the Rutherfords note the Texarkana opinion in *Wagner & Brown* cites no authority supporting the well by well approach. *See Wagner & Brown*, 198 S.W.3d at 380-81. They further argue that based on the Supreme Court's holdings and tenor in its opinion, the Court would have overruled a well by well approach had that issue been appealed. *See Wagner & Brown*, 282 S.W.3d at 425-27. We agree with Prize and the Rutherfords.

We have found no case other than the Texarkana opinion which applies a strict well by well analysis to a co-tenant's reimbursement claim. *See Wagner & Brown*, 198 S.W.3d at 380-81. We note, however, that as a general rule oil and gas wells are characterized as improvements to real property; as such, equitable principles apply and dictate that a person who "in good faith makes improvements upon property owned by another is entitled to compensation therefore." *Wagner & Brown*, 282 S.W.3d at 425-26. Furthermore, "[i]t has long been the rule in Texas that

381 n.7.

a cotenant has the right to extract minerals from common property without first obtaining the consent of his cotenants; however, he must account to them on the basis of the value of any minerals taken, *less the necessary and reasonable costs of production and marketing."* *Id.* at 426 (emphasis in original). The Supreme Court in reversing the court of appeals, although not addressing the well by well analysis, *clearly* stressed the equitable nature of a reimbursement-for-improvements claim. *Id.* at 428. The Court stated,

> Given the equitable nature of a reimbursement-for-improvements claim, we decline to read Texas law as establishing that drilling costs are *always* or *never* recoverable when a lease expires. Instead, we believe the equitable nature of such claims must turn on the equities in each case. . . . As with other equitable actions, a jury may have to settle disputed issues about what happened, but 'the expediency, necessity, or propriety of equitable relief' is for the trial court, and its ruling is reviewed for an abuse of discretion.

*Id.* at 428-29 (emphasis in original).

Applying the above principles to the facts in *Wagner & Brown*, the Supreme Court held that the trial court and court of appeals abused their discretion in declaring costs unrecoverable, because there was evidence that those costs benefitted the estate. *Id.* at 429. The Supreme Court relied on fairness considerations, as well as past and potential future benefits to the estate from future wells that may be drilled, when ruling the trial court abused its discretion in refusing reimbursement of drilling costs. *Id.* at 424-25, 428-29. Applying the reasoning found in the Supreme Court's decision in *Wagner & Brown*, we decline to apply a strict well by well approach to the costs at issue in this case, and instead will review the trial court's determination of the equities from the evidence presented under an abuse of discretion standard.

Turning to the evidence, Hoskins discounts the argument by Prize and the Rutherfords that the unprofitable Baker wells nonetheless benefitted the co-tenancy by (i) preventing drainage from nearby development, (ii) providing beneficial geological "wellbore" information,

and (iii) permitting re-entry of the unplugged wells in the future. The record confirms that Prize's expert, Don Ray George, testified extensively that the expenses from Baker Well Nos. 8, 11, and 13 were reasonable and necessary and benefitted the estate. Specifically, George testified that Well Nos. 8, 11, and 13 were drilled in "good faith to offset and develop the reservoirs." He testified the operator and the other mineral interest owners gained a myriad of valuable information "beneficial to the overall development of the minerals underlying the Earl Baker Estate" from the drilling of these wells. George opined, "[I]t's a continuing benefit to be able to not only tell what the geology looks like, but the extent of reservoirs, the quantity of the hydrocarbons that's there, whether or not there's an active water drive or what type of reservoir mechanism each of those individual reservoirs is producing under." George further testified that Well Nos. 8 and 11 were not plugged (Well No. 13 is still producing) and could be re-entered in the future if and when economics improve. Hoskins' expert, Peter Huddleston, offered no testimony to controvert George's testimony that Well Nos. 8, 11, and 13 did benefit the estate or that the expenses from the three wells were unnecessary or unreasonable. Hoskins does point to the testimony of several fact witnesses and argues that this testimony contradicts any possible benefit to the estate (i.e., the wells did not prevent drainage, may never be re-entered for future operations, and only "potentially" provided useful geological benefits.). Resolution of any conflicts in the evidence was within the court's province as the finder of fact. *See City of Keller*, 168 S.W.3d at 819 (it is the sole province of fact finder to determine credibility of the witnesses and weight to be given their testimony).

Hoskins also complains that all of the costs of the non-producing wells were incurred after BP's June 25, 2004 letter concerning termination of the JOA, and after suit was filed. As noted earlier, however, the long standing rule is that a co-tenant has the right to extract minerals

from the common estate without the consent of his cotenants.[21] *Wagner & Brown*, 282 S.W.3d at 426. George's testimony and the record indicate that the expenses from Well Nos. 8, 11, and 13 should be included in any net revenues calculation because Hoskins also sought and obtained an interest in those wells through its title claims in this suit.

(2) **COPAS Overhead.** Hoskins further claims the COPAS[22] overhead costs permitted by the trial court should have been excluded, thereby increasing Hoskins' damages by $81,085. As with the well by well determination, it is for the fact finder to determine whether an overhead charge is properly deductible as a reasonable and necessary expense. *Id*. at 425 (overhead expenses on a lapsed lease were properly charged as long as they were reasonable and necessary). George testified that the COPAS overhead charge was reasonable and necessary and standard in the industry. He also testified that the co-tenants benefitted from the services associated with these charges. Hoskins' expert did not dispute this testimony, stating that he made no determination as to the reasonableness or necessity of the charges.

In summary, the trial court did not abuse its discretion in rejecting a well by well approach to calculate Prize's and the Rutherfords' reimbursement-for-improvements claim and in awarding Hoskins unpaid "net revenues" calculated as "gross revenues less reasonable and necessary expenses beneficial to the Subject Acreage and including Baker Well Nos. 8, 11 and 13." Furthermore, there is ample evidence supporting the trial court's implied finding that the costs associated with Well Nos. 8, 11, and 13 and the COPAS overhead were reasonable,

---

[21] The trial court's final judgment recognized that because the El Paso and Baker Leases terminated by their terms in August 2001, "Hoskins's and BP's mineral rights and interests therefore reverted to them at that time, free and clear from the 1967 JOA and anyone claiming thereunder, making Hoskins and BP co-tenants."

[22] As defined by Hoskins, "COPAS" overhead is a "fixed amount of overhead paid to the operator for their supervision of operations" according to the terms of the operating agreement. Hoskins concedes that Article 8 of the JOA called for payment of COPAS overhead to the operator, Prize and the Rutherfords, but argues the JOA had terminated and the defendants did not prove the COPAS was a reasonable and necessary expense.

necessary, and beneficial to the estate. We therefore overrule Hoskins' third issue on cross-appeal.

## III. BP's Challenge to Damages Award

In its third issue on cross-appeal, BP complains the trial court erred in permitting Prize and the Rutherfords to satisfy their obligation to account to BP for its share of net revenues by tendering to BP its applicable share of gas in-kind at the wellhead in lieu of payment of its share of proceeds from the sale of production. The trial court ordered in the last substantive paragraph of the judgment that, "any party who is a producing co-tenant of oil, gas and/or condensate from the Subject Acreage shall account to the non-producing parties." Specifically, the court ordered that Prize and the Rutherfords, "for so long as they remain as producing co-tenants, shall have the continuing obligation to account to Hoskins and BP for their respective shares of net revenues attributable to the Subject Acreage." The trial court further provided:

> As to any revenues which have not previously been distributed by the Defendants, BP and Hoskins shall be entitled to receive their respective shares of production revenues directly from the first purchaser of such production and the operators shall take such actions as are necessary to cause such direct payment. Defendants, <u>at their option</u>, may also satisfy their obligations under this paragraph by <u>tendering Hoskins and BP their applicable share of gas in kind at the wellhead in lieu of payment</u>.

(emphasis added).

BP argues the trial court's judgment should be modified to remove the take-in-kind option because no legal authority exists allowing the producing co-tenant to force the non-producing co-tenant to take a share of gas at the wellhead instead of receiving its share of net production proceeds after the gas is treated and marketed. In response, Prize and the Rutherfords

argue the trial court acted within its discretion in allowing them to tender gas in-kind at the wellhead.[23] We disagree.

Allowing a co-tenant to tender gas in-kind at the wellhead is inconsistent with Texas co-tenancy law which provides that "a cotenant who produces minerals from common property without having secured the consent of his cotenants is accountable to them on the basis of the value of the mineral taken less the necessary and reasonable cost of producing and marketing the same." *Cox*, 397 S.W.2d at 201. Prize and the Rutherfords cite us to no authority showing that a producing co-tenant can comply with its duty to account to a nonproducing co-tenant by tendering the applicable share of gas "in kind" at the wellhead. A trial court abuses its discretion if it acts without regard for any guiding rules or principles. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995). Accordingly, we grant BP's third issue on cross-appeal and modify the trial court's judgment to remove the last sentence of the last substantive paragraph of the final judgment, quoted above, which permitted Prize and the Rutherfords to satisfy their obligations to account to Hoskins and BP by tendering "their applicable share of gas in kind at the wellhead in lieu of payment."

## IV. The Rutherfords' Challenge to Damages Award

Because we have sustained the damages award to Hoskins and BP, we must address the issues raised by the Rutherfords with respect to damages. The Rutherfords assert in two issues that all of the Rutherford Children[24] are not liable for damages because they did not own any fee

---

[23] Prize and the Rutherfords also argue that because BP, not Hoskins, appealed this portion of the judgment, this issue must be rejected since BP's royalty interest burdens only Hoskins' interest. Therefore, Prize and the Rutherfords contend BP is not entitled to any revenues or any gas from them, and must look only to Hoskins for payment of its royalty. For the reasons stated *supra*, we have rejected the argument that Prize and the Rutherfords have no obligation to pay BP its royalties. *See* TEX. NAT. RES. CODE ANN. §§ 91.401, 91.402.

[24] The "Rutherford Children" consist of eight individuals: Stevan D. Rutherford, Patrick R. Rutherford, III, David Traylor Rutherford, John Richard Rutherford, Mary Elizabeth Rutherford, Paul Maroney Rutherford, Michael G. Rutherford, Jr., and Sally Ann Rutherford.

interests in the mineral estate, but rather owned only leasehold working interests.  They further argue the trial court improperly imposed joint and several liability against all defendants under the judgment because there was no claim upon which a finding of joint and several liability could be made.

**(1) Rutherford Children.**  A trial court may not grant relief on a theory of recovery not sufficiently stated in the party's live pleadings or tried by consent.  *See* TEX. R. CIV. P. 301 (judgment of the court shall conform to the pleadings); *Herrington v. Sandcastle Condominium Ass'n*, 222 S.W.3d 99, 102 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  To determine whether an issue was tried by consent, we examine the record for evidence of whether the parties actually *tried* the issue.  *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 281 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding even though trial court found disclaimer was conspicuous, it erred in finding disclaimer barred plaintiff's recovery because issue was not tried by consent and thus not properly before court).  Trial by consent is not a general rule of practice and should not be applied unless clearly warranted.  *Haas v. Ashford Hollow Cmty. Improvement Ass', Inc.*, 209 S.W.3d 875, 883-84 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  A party's unpleaded issue may be deemed tried by consent when evidence on the issue is developed under circumstances indicating both parties understood the issue was in the case, and the other party failed to make an appropriate complaint.  *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 719 (Tex. App.—Dallas 2004, no pet.).

As we have previously held, the court's damages award to BP and Hoskins was made pursuant to the TNRC.  In its last amended petition regarding its claim under the TNRC, BP did not include the Rutherford Children, but sought to recover its share of production revenues "jointly and severally" only from "Prize Energy, Prize Operating, Gruy, Rutherford Oil and/or

Hunter Gathering" as "payors" under the TNRC. Similarly, Hoskins affirmatively states that the "only" cause of action it asserts against the Rutherford Children is its suit to remove the cloud on Hoskins' title to an undivided 25% mineral interest in the Subject Acreage. In addition, the record does not reflect that the issue of the Rutherford Children's liability for any damages was actually *tried* by consent. Accordingly, the Rutherford Children's issue is sustained, and the judgment will be modified to reflect that the damages award is not assessed against the Rutherford Children.

**(2) Joint and Several Liability Against All Defendants.** The Rutherfords also argue the trial court improperly imposed joint and several liability against all the defendants. BP and Hoskins respond that the trial court expressly found that "all defendants" committed a good faith trespass, and, under Texas law, each trespasser may be held jointly liable for the whole amount of the damages. First, we disagree with BP's and Hoskins' characterization of the trial court's judgment. In its interlocutory judgment, the trial court's very first ruling stated:

> The court GRANTS Defendants' Motions for Summary Judgment [defining the defendants to include the Rutherford Children] on all Plaintiffs' claims of trespass. Plaintiffs shall take nothing from Defendants on **any trespass claim** in this cause. (emphasis added).

The trial court again in its final judgment repeated that it was granting the defendants' motion for summary judgment on all claims of trespass and further "ORDER[ED] that Hoskins, BP and Bank of America, N.A., as Trustee of the Baker Trusts take nothing on their trespass claims. . . ."

Second, while we have upheld the award of damages under Chapter 91 of the TNRC, the statute does not address joint and several liability among payors. By analogy, co-tenancy law is clear that the obligations of co-tenants are based on their proportional share. As the Supreme Court has noted, when dealing with obligations of co-tenants, "the rule of accountability is the proportionate market value of the product less the proportionate necessary and reasonable costs

of producing and marketing." *Cox*, 397 S.W.2d at 203. Here, during the time period from August 2001 to October 2008, the period for which damages were awarded against Prize and the Rutherfords, all the parties were in a co-tenancy relationship. Since a recovery against co-tenants is not generally imposed as a joint and several liability, we see no reason why a recovery of unpaid oil and gas proceeds against co-tenants under the TNRC would be treated any differently. Accordingly, we sustain the Rutherfords' issue, and will modify the judgment to delete the imposition of joint and several liability among all the defendants.

### ATTORNEYS' FEES & INTEREST

We next address the parties' arguments concerning recovery of attorneys' fees and interest. The trial court did not award attorneys' fees to any party because it found the underlying nature of the case was a determination of title; the court made an alternative finding that reasonable and necessary attorneys' fees were $900,000 for each group of parties. In awarding damages to Hoskins and BP, the court also awarded pre-judgment interest at 5% per annum simple interest from December 22, 2004 until the day before the date of the final judgment, and post-judgment interest at 5% per annum, compounded annually.

On appeal, Prize and the Rutherfords assert they are entitled to recover attorneys' fees because they prevailed on summary judgment against the theft claims brought by Hoskins, BP, and the Bank; they also assert the court's award of pre-judgment and post-judgment interest should be reversed. Hoskins and BP argue they should have been awarded attorneys' fees because they prevailed in obtaining their share of revenues under the TNRC.[25]

---

[25] The Bank's challenge to the trial court's assessment of Prize's and the Rutherfords' costs is separately addressed under the Bank's cross-appeal.

**I. Prize's and the Rutherfords' Issues**

    **(1) Recovery of Attorneys' Fees Under Texas Theft Liability Act.** In Issue No. 5 of the main appeal, Prize and the Rutherfords argue they should each have recovered $900,000 in attorneys' fees because they prevailed on summary judgment against the civil theft claims brought by Hoskins, BP, and the Bank under the Texas Theft Liability Act. See TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001-.005 (West 2005). Prize and the Rutherfords contend the award of their attorneys' fees was mandatory under the statute because they successfully defended against the plaintiffs' civil theft claims. *See id.* § 134.005(b) (providing "[e]ach person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees"); *see also Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 686 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (recognizing "unusual" nature of Texas Theft Act in that it requires the court to award attorney's fees to a party who successfully defends against a Theft Act claim without any finding that the theft claim is groundless, frivolous, or brought in bad faith).

    Hoskins, BP, and the Bank offer several responses, one of which is that Prize and the Rutherfords failed to plead for recovery of their attorneys' fees under the Theft Liability Act. We agree. As noted, supra, a trial court may not grant relief on a theory of recovery not sufficiently stated in the party's live pleadings or tried by consent. *Herrington*, 222 S.W.3d at 102. The purpose of pleadings is to give an adversary notice of claims and defenses, as well as notice of the relief sought. *Perez v. Briercroft Serv. Corp.*, 809 S.W.2d 216, 218 (Tex. 1991). Here, Prize and the Rutherfords did not place the plaintiffs, or the trial court, on notice that they were seeking to recover their attorneys' fees under section 134.005(b) by so stating in their summary judgment motion or any other pleading before the trial court at the time it rendered

judgment.[26]  On appeal, Prize and the Rutherfords make no attempt to direct us to any place in the record where they requested section 134.005(b) attorney's fees in the trial court.  To the contrary, Prize and the Rutherfords argue in their reply brief that because recovery of attorneys' fees is mandatory under section 134.005(b), they did not need to make the trial court or plaintiffs aware of their request for attorneys' fees under that statute.  The cases cited by Prize and the Rutherfords do not support their argument because the parties seeking recovery of attorney's fees in those cases made the request in the trial court.  *See, e.g., Robinson v. Brannon*, 313 S.W.3d 860, 868 (Tex. App.—Houston [14th Dist.] 2010, no pet.).  In addition, in a case decided under the Theft Liability Act, the Dallas court of appeals held that prevailing defendants were not entitled to recover their attorneys' fees under section 134.005(b) because the defendants failed to specifically request recovery of attorneys' fees under section 134.005(b) in any pleading in the trial court.  *Cricket Communications, Inc. v. Trillium Indus., Inc.*, 235 S.W.3d 298, 310 (Tex. App.—Dallas 2007, no pet.).  We agree with the reasoning of the Dallas court.

Because Prize and the Rutherfords failed to specifically request recovery of their attorneys' fees under section 134.005(b) in the trial court, and the issue was not tried by consent, we hold the trial court did not abuse its discretion in failing to award them attorneys' fees under the Theft Liability Act.  *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) (appellate court reviews trial court's decision to award attorney's fees for abuse of discretion).

**(2)  Assessment of Pre-Judgment Interest.**  In their Issue No. 4, Prize and the Rutherfords assert the court's award of pre-judgment interest under the TNRC should be reversed.  We agree.  Even though the trial court did not expressly state the basis for its award of pre-judgment interest, as we have previously held, it is clear from the judgment as a whole that

---

[26] In addition, the record does not reflect the issue of recovery of Prize's and the Rutherfords' attorneys' fees under section 134.005(b) was tried by consent. *See Johnson*, 148 S.W.3d at 719.

the court based its award of damages on section 91.402(a) of the TNRC. TEX. NAT. RES. CODE ANN. § 91.402(a). Section 91.403 provides that a payor who fails to comply with the time limits for making the payments required under section 91.402(a) must pay interest to the payees. Id. § 91.403(a). Subsection (b) of section 91.402, however, provides a "safe harbor" which permits a payor to withhold or suspend payments beyond the time limits without being subject to pre-judgment interest when there is "a dispute concerning title that would affect distribution of payments." Id. §§ 91.402(b)(1), 91.403(b) (recognizing the interest exceptions stated in section 91.402(b)); *Headington Oil Co., L.P. v. White*, 287 S.W.3d 204, 210 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *Gore Oil Co. v. Roosth*, 158 S.W.3d 596, 602 (Tex. App.—Eastland, 2005, no pet.).

Here, as noted supra, the trial court found the underlying nature of Hoskins' and BP's suit was a title determination of their interest in the Baker Property. We agree. The record is clear that a legitimate question concerning title to the 25% unleased mineral interest originally owned by ARCO, to which BP succeeded and sold to Hoskins, was the underlying basis for this case, and that the title dispute affected the rights of Hoskins and BP to receive payments under section 91.402(a). Therefore, prejudgment interest was not recoverable under the plain language of section 91.402(b)(1). *Concord Oil*, 966 S.W.2d at 461. Finally, the award of pre-judgment interest may not be sustained under equity, or common law, as argued by Hoskins and BP, because the Supreme Court has stated that the statute controls. *Id.* at 462-63 (holding that, when there is a title dispute affecting distributions of oil and gas proceeds, equitable prejudgment interest may not be awarded under common law because it would be in direct conflict with

section 91.402(b) of the TNRC).[27]  Accordingly, we sustain Prize's and the Rutherfords' issue challenging the award of pre-judgment interest,[28] and will modify the judgment to delete the award of pre-judgment interest.

## II.  Hoskins' and BP's Issue

On cross-appeal, Hoskins and BP assert in their third and first issues, respectively, that they are entitled to receive their attorneys' fees because they obtained relief under the TNRC. We agree.  We have held, supra, that the court's award of net revenues and royalties to Hoskins and BP was made pursuant to section 91.402(a) of the TNRC.  Section 91.406 provides that, "if a suit is filed to collect proceeds and interest under this subchapter, the court shall include in any final judgment in favor of the plaintiff an award of: (1) reasonable attorney's fees . . . ."  TEX. NAT. RES. CODE ANN. § 91.406 (West 2001).  Both Hoskins and BP brought claims to recover their unpaid share of the oil and gas proceeds, plus interest, under sections 91.402 and 91.403 of the TNRC, and they received a favorable judgment on those claims in the trial court; in addition, they expressly requested recovery of their attorneys' fees under the TNRC.  Id. §§ 91.402, 91.403.  Since we are affirming the trial court's award of damages to Hoskins and BP on the basis of their TNRC claims, BP and Hoskins have obtained a "favorable" result under the plain language of section 91.406.  *See Headington*, 287 S.W.3d at 215-16 (noting that a judgment is "favorable" to the plaintiff when he obtains "a measure of relief which leaves him in a better position that he held before filing suit," and upholding award of attorneys' fees under section 91.406 to plaintiff who was awarded unpaid royalties).

---

[27] Hoskins and BP rely on our prior opinion in *Marshall* as support for the award of pre-judgment interest. However, *Marshall* is distinguishable because the pre-judgment interest was awarded on fraud claims, not under the TNRC.  *Marshall*, 288 S.W.3d at 455.

[28] To the extent Prize and the Rutherfords challenge the award of post-judgment interest on the damages, they make no clear argument explaining the legal basis for their challenge and cite no legal authority.  Therefore, the issue is waived.  TEX. R. APP. P. 38.1(i).

Prize and the Rutherfords argue that because recovery of attorney's fees is barred in a trespass to try title action, and the trial court found the underlying nature of the case was "to obtain a declaration of title," an award of attorneys' fees to Hoskins and BP under the TNRC would be improper. *See Marshall*, 288 S.W.3d at 464 (citing *EOG Resources, Inc. v. Killam Oil Co.*, 239 S.W.3d 293, 304 (Tex. App.—San Antonio 2007, pet. denied)). Prize and the Rutherfords cite us to no case under the TNRC holding that attorneys' fees should not be awarded in a case involving a title dispute. In fact, the statutory language of TNRC section 91.406 contains no exception prohibiting recovery of attorney's fees in a title dispute. Since the legislature excluded pre-judgment interest from a potential recovery in section 91.402(b)'s "safe harbor" provision, the legislature clearly also could have excluded attorney's fees from a potential recovery if that was its intent; the legislature chose not to do so. *See Fireman's Fund County Mut. Ins. Co. v. Hidi*, 13 S.W.3d 767, 769 (Tex. 2000) (when the legislature employs a term in one section of a statute and excludes it in another, we must presume it had a reason for excluding the term); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 256 (Tex. 2008) (court must not interpret a statute in a manner that renders any part meaningless or superfluous); *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998) (we construe a statute to ascertain and effectuate the legislature's intent by first looking to the plain and common meaning of the statute's language, viewing it in the context of the statute as a whole and giving it full effect). Accordingly, we conclude the trial court erred in not awarding Hoskins and BP their attorneys' fees under section 91.406 of the TNRC. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (availability of statutory attorney's fees is a question of law which appellate court reviews de novo).

Finally, Prize and the Rutherfords assert the $900,000 amount of attorneys' fees is excessive because it is "based on a 95% allocation of attorney work to the TNRC cause of action and only 5% to all other causes of action and defenses." They contend the majority of the issues in the case involved trespass and title, not "prompt-payment issues under the TNRC;" therefore, the $900,000 amount is not supported by the record. First, we have already rejected the argument that the TNRC is merely a prompt payment statute devoid of a cause of action for nonpayment of oil and gas proceeds, and have upheld the damages awards under the TNRC claims. Second, our review of the record confirms that the trial court's finding that the allocation of a majority (95%) of the attorneys' work to the TNRC claims was not unreasonable; further, the fee amount of $900,000 is a reasonable and necessary amount supported by the record.

The record shows that BP and Hoskins sufficiently proved up their attorneys' fees at trial, with attorney Thomas Zabel[29] testifying as to segregation among claims as well as the amount of fees incurred. Specifically, Zabel testified that, with the exception of the alternative breach of contract claim brought by BP, all the claims asserted by BP and Hoskins depended on the same set of facts (i.e., that the JOA had terminated in August 2001), and that resolution of the declaratory judgment claim clearing title was beneficial to, and a necessary pre-requisite to, the right as payees to recover production proceeds under the TNRC claims. Zabel stated, "there was minimal time that can be segregated out that was unique to [claims for which no attorneys' fees are provided . . . cloud on title, . . . trespass, conversion], but prosecuting those claims further, it be[ne]fitted the natural resources claims, the theft act claims, the breach of contract claims, the declaratory judgment claims, that all have attorneys fees that are provided for." Zabel also testified the issues in the case were relatively complex and required sophisticated oil and gas attorneys, there were multiple hearings, and that efforts had to be devoted to defeating the

---

[29] Attorney Thomas Zabel was designated as the attorneys' fees expert for Hoskins as well as BP.

numerous defenses and counterclaims asserted by Prize and the Rutherfords in order to prevail on the TNRC claims. Zabel stated that attorneys' fees of $900,000 each would be reasonable, even though more fees were incurred, based on an allocation of approximately 5% for work unique to claims for which attorneys' fees are not recoverable and 95% for work benefitting the TNRC claims. Prize and the Rutherfords offered no contradictory evidence.

The trial court did not abuse its discretion in accepting the segregation of 5% of the attorneys' work as unique to non-fee claims and 95% to the TNRC claims. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006) (requiring segregation of attorney's fees that relate solely to a claim for which fees are unrecoverable, but also noting that in many cases legal fees cannot and need not be precisely allocated to one claim or the other, *and* that segregation may be based on percentage estimates). Further, the reasonableness of the allocation and $900,000 amount of fees is supported by sufficient evidence in the record. Id. at 313-14 (segregation of attorney's fees among multiple claims is a mixed question of law and fact).

Accordingly, we hold that Hoskins and BP[30] are both entitled to recover attorneys' fees under section 91.406 of the TNRC, and that the trial court's (alternative) finding that $900,000 is the amount of reasonable and necessary attorneys' fees incurred by Hoskins and BP on their TNRC claims is supported by the record and is not an abuse of discretion. Therefore, we sustain this issue and we will render judgment awarding $900,000 in attorneys' fees to both Hoskins and BP on their TNRC claims.[31]

---

[30] Prize and the Rutherfords also state that "BP has not incurred any attorneys' fees at all" because Hoskins is indemnifying BP. They cite no authority, and engage in no analysis, in support of this contention; therefore, it is waived. TEX. R. APP. P. 38.1(i).

[31] Hoskins and BP also ask for conditional attorneys' fees on appeal; although Zabel testified about the amount of attorneys' fees on appeal, the trial court made no finding on conditional appellate fees and no objection was raised.

**SANCTIONS AGAINST HOSKINS**

Next, Hoskins challenges the trial court's assessment of $200,000 in sanctions against him for discovery abuse committed by counsel Bryan Leitch. Specifically, Hoskins asserts: (1) there was no pleading to support a monetary sanctions award; (2) defendants offered no competent evidence of monetary harm suffered as a result of the alleged discovery abuse; (3) there was no direct relationship between the discovery abuse and the sanction imposed; and (4) the award was unreasonable, excessive, unrelated to the alleged discovery abuse, and constitutes an impermissible penalty.

**(1) Factual Background.** Prize and the Rutherfords filed a motion for sanctions against Hoskins and Leitch alleging that Leitch, counsel for Hoskins and the Baker Trusts, committed serious misconduct, including witness tampering and obtaining documents under false pretenses. The motion further alleged that Leitch's actions were known to and approved, at least in part, by his clients. Prize and the Rutherfords requested that the trial court strike the pleadings of Hoskins and the Baker Trusts.

At the sanctions hearing, Prize and the Rutherfords offered 39 exhibits to support their claim of misconduct by Leitch. Without identifying himself as an attorney, Leitch wrote to potential witnesses and obtained documents for use in the case. Leitch used false letterhead in which he claimed to be a businessman for "Oil and Gas Properties" or "Mi Oil." Katy Brymer, an assistant to a Prize contract pumper, testified by deposition that Leitch contacted her and told her that he worked for an oil company and asked to meet with her to discuss a job opportunity. Leitch set up a meeting with Brymer, and at the meeting falsely told her he was investigating criminal conduct by Prize; he then offered to pay her in exchange for her assistance in the case.

Leitch also went to Brymer's house when she was not home and tried to crawl through her fence. Brymer was upset when she learned that Leitch had misrepresented himself to her.

Rick Rudolph, president of South Texas Gas Services, a nonparty to this appeal, testified by deposition that he met with Leitch and Cliff Hoskins. At the meeting, in the presence of Hoskins, Leitch told Rudolph, who performed the gas-chart integrations, that if he would provide assistance to them in this case, they could "swing some business" his way. Rudolph stated that Leitch continually badgered him to produce documents that had already been provided, and also threatened him and South Texas Gas with criminal penalties for spoliation of evidence. Due to this harassment, Rudolph hired Thompson & Knight to represent him and South Texas Gas in this matter. Leitch was then notified by Thompson & Knight that Rudolph and South Texas Gas were represented and that all communications should be directed to counsel.

Despite this warning, Leitch hired a local attorney, John Miller, to visit the Rudolphs at their business in Sinton, Texas. Thompson & Knight was not informed that this contact would take place. Leitch told Miller that Rudolph was not represented by counsel. Miller informed the Rudolphs that it would be in their best interest to obtain counsel and that Hoskins would pay for a lawyer. Rudolph also remembered Miller saying that if they agreed to allow Leitch to pay for their legal representation, Leitch would keep them from being held liable to the other plaintiffs. At Leitch's direction, Miller spoke to Rudolph about giving a deposition in the case. Miller was surprised to learn that the Rudolphs did in fact have retained counsel.

At his deposition on August 12, 2005, Cliff Hoskins admitted that he was aware of some of Leitch's misconduct. Hoskins acknowledged that he authorized the letters sent to nonparties on false letterhead as part of the investigation Leitch was conducting. Additionally, Hoskins attended the deposition of Katy Brymer on May 17, 2006, and at that time became aware of

Leitch's improper conduct as to Brymer. Additionally, Hoskins verified interrogatory answers which sought information about Leitch's misconduct. Hoskins' co-counsel, Timothy Robinson, was also copied on Prize's counsel's communications complaining of Leitch's improper conduct which were sent to all counsel of record from November 2005 through June 2006, thereby putting Hoskins on notice of Leitch's misconduct. Despite this knowledge, Hoskins continued to retain Leitch.

Following the presentation of this evidence, the trial court ordered that Leitch be removed as counsel and disqualified as an attorney for Hoskins. Thereafter, the trial court stated in a letter to counsel that, "After careful consideration, the court does find that the actions's [sic] attributable to Cliff Hoskins (Cliff Hoskins, Inc.) are sanctionable, however, such actions do not rise to the level that warrants striking all pleadings and resulting in the Death Penalty in this cause. . . . The Court will continue to examine the appropriate sanctions to deter Mr. Hoskins and other similarly situated parties of future litigations [sic]."

At a later date, the trial court heard evidence to determine monetary sanctions. Counsel for Prize testified that, in light of the facts and the goals of deterrence, and taking into account the lack of acceptance of responsibility by Hoskins or his counsel, a reasonable monetary sanction against Hoskins would be $300,000. Counsel for the Rutherfords testified that, in his opinion, an appropriate monetary sanction would be $500,000, due to Hoskins' affront to the judicial process and the court's inherent power to protect the judicial process. The trial court ordered that "based upon the scale of this litigation and the egregious conduct that abused the judicial process, the Prize Defendants shall have and recover attorneys' fees in the sum of $100,000.00 from Hoskins as monetary sanctions, and that the Rutherford Defendants shall have and recover attorneys' fees in the sum of $100,000.00 from Hoskins as monetary sanctions."

**(2) Standard of Review.** We review a trial court's ruling on a motion for sanctions under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004); *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 56 (Tex. App.—San Antonio 2006, no pet.). "The test for an abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action, but 'whether the court acted without reference to any guiding rules and principles.'" *Cire*, 134 S.W.3d at 838-39 (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985)). Therefore, we will reverse the trial court's ruling only if it was arbitrary or unreasonable. *Cire*, 134 S.W.3d at 839. In reviewing the imposition of sanctions, the appellate court examines the entire record, including "evidence" admitted at the hearing, arguments of counsel, the written discovery on file, and the circumstances surrounding the party's alleged discovery abuse. *U.S. Fidelity & Guar. Co. v. Rossa*, 830 S.W.2d 668, 672 (Tex. App.—Waco 1992, writ denied).

**(3) Applicable Law.** The trial court has discretion to impose sanctions for discovery abuse under Rule 215.3. TEX. R. CIV. P. 215.3. There are three legitimate purposes of discovery sanctions: (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992) (orig. proceeding); *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex. 1986). Discovery sanctions must also be "just." TEX. R. CIV. P. 215.2(b); *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003); *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding) ("the punishment should fit the crime"). We apply a two-part test to determine whether non-death penalty sanctions are just: (1) a direct relationship between the offensive conduct and the sanction imposed must exist; and (2) the sanction imposed must not be excessive. *Spohn Hosp.*, 104 S.W.3d at 882; *TransAmerican*, 811

S.W.2d at 917; *Vela*, 203 S.W.3d at 58. A "just" sanction must be directed against the abuse and toward remedying the prejudice caused to the party. *Spohn Hosp.*, 104 S.W.3d at 882. As to the second prong, the sanction should be no more severe than necessary to satisfy its legitimate purposes, and the court must first consider whether less stringent sanctions would promote full compliance and deter future abuse. *Id.*; *Blackmon*, 841 S.W.2d at 849.

(4) **Analysis.** Hoskins first contends monetary sanctions were improper because they were not pleaded or requested at or prior to the scheduled hearings; rather, Prize and the Rutherfords sought only death penalty sanctions, not monetary sanctions. Hoskins relies on *In re Estate of Gaines*, 262 S.W.3d 50, 60 (Tex. App.—Houston [14th Dist.] 2008, no pet.), which holds that "jurisdiction to render a judgment for attorney's fees must be invoked by the pleadings, and a judgment not supported by pleadings requesting an award of attorney's fees is a nullity." *Gaines*, however, is distinguishable because the order in that case did not impose sanctions, and, in fact, there was no notice or a hearing on the possibility of sanctions. *Id*. at 60-61. The court held that pleadings were required because the attorney's fees were awarded pursuant to a statutory provision. *Id*. Here, Rule 215.2 permits the imposition of sanctions after "notice and a hearing," both of which were provided to Hoskins. TEX. R. CIV. P. 215.2(b). Further, Prize and the Rutherfords were not required to specifically plead for monetary damages because "[c]ourts possess inherent powers to discipline attorney behavior through the imposition of sanctions *sua sponte* in appropriate cases." *Roberts v. Rose*, 37 S.W.3d 31, 33 (Tex. App.—San Antonio 2000, no pet.); *see also In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997) (orig. proceeding) (holding that even in the absence of an applicable rule or statute, a trial court has the inherent power to sanction a party for bad faith abuse of the judicial process). Moreover, the range of sanctions available to the trial court under Rule 215 is quite broad. *TransAmerican*, 811

S.W.2d at 918; *Clark v. Bres*, 217 S.W.3d 501, 512 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). Accordingly, we cannot conclude monetary sanctions were improper based on the absence of proper pleadings.

Next, Hoskins complains that Prize and the Rutherfords failed to offer competent evidence of monetary harm suffered as a result of the alleged discovery abuse. Specifically, Hoskins contends that because Prize and the Rutherfords did not introduce attorneys' fees bills, there was no evidence of the reasonable expenses related to the discovery abuse. When the judgment is not one for earned attorneys' fees, but rather a judgment imposing attorneys' fees as sanctions, it is not invalid because a party fails to prove attorneys' fees. *Scott Bader, Inc. v. Sandstone Prods., Inc.*, 248 S.W.3d 802, 816 (Tex. App.—Houston [1st Dist.] 2008, no pet.). "When attorney's fees are assessed as sanctions, no proof of necessity or reasonableness is required." *Id.* at 817 (quoting *Miller v. Armogida*, 877 S.W.2d 361, 365 (Tex. App.—Houston [1st Dist.] 1994, writ denied)). Therefore, we cannot conclude the award of sanctions was improper based on insufficient evidence.

Hoskins also argues the trial court abused its discretion in awarding monetary sanctions because there was no direct relationship between the discovery abuse and the sanction imposed. Specifically, Hoskins maintains that its former counsel, Leitch, was solely responsible for the alleged discovery abuses. Hoskins argues that, of the discovery abuses cited, the only abuse that Prize and the Rutherfords allege Hoskins should have known about was the meeting between Leitch, Cliff Hoskins, and Rick Rudolph. The other alleged abuses involve Hoskins' attendance at depositions, where he merely obtained knowledge of Leitch's improprieties that had already occurred.

The trial court must at least attempt to determine whether the offensive conduct is attributable only to counsel, only to the party, or to both. *Paradigm Oil, Inc. v. Retamco Operating, Inc*., 161 S.W.3d 531, 537 (Tex. App.—San Antonio 2004, pet. denied) (citing *TransAmerican*, 811 S.W.2d at 917). Although a party should not be punished for counsel's conduct in which the party is not implicated apart from having entrusted its legal representation to counsel, a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of the discovery rules. *Paradigm*, 161 S.W.3d at 537. Ultimately, the sanction imposed by the trial court must relate directly to the abuse found. *Id*.

Here, Prize and the Rutherfords presented some evidence that Hoskins was at least aware of Leitch's misconduct. In his own deposition, Hoskins admitted that he authorized the letters sent by Leitch to nonparties on false letterhead as part of the investigation Leitch was conducting. Additionally, Hoskins verified interrogatory answers which sought information about Leitch's misconduct. Hoskins was also put on notice of Leitch's improper conduct because co-counsel was copied on Prize's counsel's communications to all counsel of record complaining of Leitch's improper conduct. We conclude the record supports the trial court's finding that Hoskins, not just Leitch, should be sanctioned. Thus, there was a direct relationship between Hoskins' conduct and the resulting sanctions.

Finally, Hoskins maintains that the award of $100,000 to each group of defendants was unreasonable, excessive, unrelated to the alleged discovery abuse, and constitutes an impermissible penalty. Reviewing the record as a whole, we conclude the trial court's order meets both parts of the test for a "just" sanction based on the discovery abuse by Leitch. Leitch's actions violated Texas Disciplinary Rules of Professional Conduct 4.01, 4.03, 4.04, and

8.04.[32]  *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 4.01(a), 4.03, 4.04, 8.04(a)(3), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (West 2005).  Such conduct involved an effort to taint and obstruct the discovery process by way of witness tampering, misrepresentation of counsel's identity, securing documents under false pretenses, contacting represented witnesses in the absence of their counsel, and falsely threatening witnesses with criminal prosecution.  As discussed earlier, these actions were known to Hoskins, who continued to retain Leitch until Leitch was disqualified by the trial court.  Given this egregious conduct, counsel for Prize and the Rutherfords testified that a reasonable monetary sanction would be in the range of $300,000 to $500,000.  The trial court declined to grant death penalty sanctions, and instead awarded sanctions in the amount of $100,000 to both Prize and the Rutherford.  We hold that based on this record, the trial court did not abuse its discretion in assessing $200,000 in sanctions for discovery abuse.  Accordingly, we affirm the portion of the trial court's judgment imposing sanctions against Hoskins.

## BANK OF AMERICA'S CROSS-APPEAL

Finally, on cross-appeal, Bank of America challenges the summary judgment granted in favor of Prize and the Rutherfords "on all claims by Bank of America, N.A., as Trustee of the Baker Trusts, including claims of fraud and rescission of the Ratification."  The Bank also

---

[32] Rule 4.01 provides: "In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person." TEX. DISCIPLINARY R. PROF'L CONDUCT 4.01(a).

Rule 4.03 provides: "In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding." TEX. DISCIPLINARY R. PROF'L CONDUCT 4.03.

Rule 4.04 provides: (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.  (b) A lawyer shall not . . . threaten to present: (1) criminal or disciplinary charges solely to gain an advantage in a civil matter." TEX. DISCIPLINARY R. PROF'L CONDUCT 4.04.

Rule 8.04(a)(3) provides: "A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation." TEX. DISCIPLINARY R. PROF'L CONDUCT 8.04(a)(3).

challenges the trial court's assessment of Prize's and the Rutherfords' costs of court against the Bank.

## I. Summary Judgment on the Bank's Claims

**(1) Relevant Factual Background.** As previously discussed, the Baker Lease terminated in August 2001 due to cessation of production for more than sixty consecutive days; the Bank, however, was not aware that the Baker Lease had expired. In 2004, Cliff Hoskins informed BP that he had information indicating that the Baker Lease, the El Paso Lease, and the JOA had expired. BP then alerted Prize that it had "received information indicating that . . . there may have been no production from the [Leased] Property between June 2001 and April 2002 and that reports filed with the Texas Railroad Commission did not properly reflect such cessation of production." BP requested specific documents to determine the current status of the JOA, but Prize refused, maintaining that "there has been continuous production." Prize advised BP to check production records filed with the Texas Railroad Commission.

In January 2005, attorneys for Hoskins sent Prize a demand letter claiming that the Baker Lease, the El Paso Lease, and the JOA had expired in August 2001 because "there has not in fact been continuous production (or Operations to restore same) either in paying quantities or otherwise in excess of at least one 60 day continuous period . . . ." Hoskins' demand letter also alleges that Prize concealed the expiration of the Leases and the JOA "by manipulating/fabricating production information and gas and condensate sales, and Revenue and Royalty information and by misrepresenting production information and gas and condensate sales information . . . ."

Prize then amended production reports ("P-2s") it had filed with the Railroad Commission in 2001. The amended P-2s, filed in 2005, reflect a reduction in the amount of gas

produced (measured in a thousand cubic feet of natural gas, abbreviated as "Mcf") on the Baker Well No. 6 for June 2001 and on the Baker Well No. 4 for July 2001. The differences between the two reports are summarized below:

| P-2s filed in 2001 | | P-2s amended in 2005 | |
| --- | --- | --- | --- |
| Baker No. 6 | Baker No. 4 | Baker No. 6 | Baker No. 4 |
| June 2001  1050 Mcf | 0 Mcf | June 2001  80 Mcf | 0 Mcf |
| July 2001  1050 Mcf | 1085 Mcf | July 2001  1050 Mcf | 0 Mcf |

The 80 Mcf of gas reported for the Baker Well No. 6 in the amended report was attributed to field use (70 Mcf) and a venting/flaring operation (10 Mcf).

On January 25, 2005, Hoskins filed suit to quiet title against Prize. As noted, *supra*, BP later joined the suit as a plaintiff, also asserting that the Leases and JOA expired in 2001. Also on January 25, 2005, the Rutherfords, acting for themselves and for Prize, approached the Bank, and requested that it sign a ratification of the Baker Lease. Rutherford representatives Mike Rutherford, Dave Lewis, and Jack Chenowith met with Penny Judge, a Bank property manager, to discuss the proposed ratification. The Rutherford representatives told Judge that Hoskins' threatened lawsuit was frivolous, but that even the threat of such a suit would cause them to stop development on the property, putting it at risk of drainage. Judge requested documentation demonstrating that the Baker Lease had not expired.

In response to her request, Mike Rutherford sent Judge a letter on February 2, 2005 attaching the Hoskins demand letter, a second letter from Hoskins' attorneys, and production data, including P-2s and gauge reports for the Baker Well No. 6.[33] In Rutherford's letter to

---

[33] Mike Rutherford testified he obtained the P-2s and gauge reports from Prize and that Prize knew they would be given to the Bank as part of the ratification negotiation.

Judge, he asserts that the Baker Lease did not terminate for cessation of production in 2001 for the following reasons:

> (a) the [Hoskins] Demand Letter ignores actual physical production of gas during the period in question, (b) the Demand Letter relies heavily on the lack of reported 'sales' of gas during June and July 2001, which we are informed by Prize may be explained by mechanical conditions affecting the gas purchaser's gas metering equipment that was installed on the Lease at the time, (c) any failure to produce constituted a temporary cessation of production, not a permanent cessation, (d) the Demand Letter misstates the legal effect of a temporary cessation of production under the Lease (and the other leases), even if one assumed that a cessation of production occurred for any duration, and (e) assuming that the Lease did terminate in mid-2001 (which we deny), the owners of the Lessee's interest under the Lease would have in any event acquired a limitations title to the leasehold estate.

Rutherford's letter concludes that Hoskins' demand letter is simply an attempt to extort money from Prize, and asserts that Hoskins' allegation could harm the Baker Trusts:

> As we discussed with you, a suspension (or abandonment) of our drilling activities caused by the mere existence of the allegation set forth in the Demand Letter would expose [the Baker Property] to substantial drainage by offset operators and thus, any delay in our operations will permanently and adversely affect both the Working Interests Owners and the Baker Trusts.

In the letter, Rutherford also asserts the operators need assurance by way of a ratification that the Baker Lease remains in effect in order to avoid suspension of drilling activities.

Rutherford's letter goes on to explain the P-2s and gauge reports. He states that the Baker Well No. 4 was shut-in for a swabbing operation in early April 2001; the operation was not successful and the well was shut-in for further evaluation. He also states that the production volumes from the Baker Well No. 6 were not fully registered by the gas metering equipment during the relevant time period, and that Prize had confirmed that, "consistent with industry practice, the 'sales' figures reported on the Forms P-2 and HPL's meter figures and the 'lease use' figures are estimates of the quantities of gas consumed on the Lease for the operation of equipment and/or quantities lost to venting." As for the gauge reports, Rutherford states in

Attachment C, entitled "Production Data," that "the No. 6 well was 'shut-in for buildup' for much of June, all of July and the first half of August, *but produced gas for a 3-day period in June (June 15th through 17th)*. [T]hus, there was no cessation of production for more than sixty consecutive days, as alleged in the Demand Letter." (emphasis added). Lewis testified that he and Chenowith went over the P-2s and gauge reports with Judge, and that they highlighted this 3-day period in June.

Judge took the ratification matter to her superior, Jeffrey Anderson, the Bank's regional team leader in the oil and gas asset management group. Judge expressed her concern to Anderson that "if there was no ratification, . . . the operator would not drill wells and the hydrocarbons couldn't be drained so there would be no royalties" for the Baker Trusts. She testified in deposition that the Bank's chief concern was future development, but that the possibility of drainage was also a concern. Judge viewed the ratification as the operator's "insurance policy" to justify spending a substantial amount of money to drill new wells. Judge stated the Bank felt the Baker Lease had not terminated because the P-2s and gauge reports did not show a cessation of production for more than sixty consecutive days and because the Bank had been consistently receiving revenues. She stated that the Bank decided to sign the ratification because of concerns over drainage and future development, and to receive $106,000 in consideration. Judge stated that had the Bank known that the Baker Lease had terminated, it would have renegotiated a lease with a higher royalty. Judge acknowledged that the Hoskins demand letter alleged that the Baker Lease had expired both because of a cessation of production exceeding sixty days and because of a failure to produce in paying quantities, but she could not recall discussing or investigating the paying quantities issue.

Jeffrey Anderson also explained that the Bank did not pursue an investigation of the paying quantities issue because it would not have been able to get the necessary expense information from the operator. The Bank's national trust oil and gas manager, Dick Sadler, testified that most operators will not divulge their costs, and that in most cases the Bank would assume there is production in paying quantities if it is receiving royalty payments. The Bank confirmed that it had been receiving royalty checks and therefore thought there were sales. Anderson further stated that the P-2s and gauge reports reflected production and that the Bank received payments on production during the relevant time period. Anderson testified that the Bank's reasoning for signing the ratification included ensuring development of the property and protecting against drainage.

In his deposition, Mike Rutherford testified he told Judge that the ratification was sought as insurance to allow Prize and the Rutherfords to continue developing the property. He acknowledged that he did not tell the Bank the following: that there was no production on the Baker Wells from June 1, 2001 to August 13, 2001; that the Baker Lease had expired in August 2001; that the claimed venting of the Baker Well No. 6 did not occur; that Prize had paid royalties on gas that was falsely reported; that Prize had filed false P-2s; or that Prize had filed false production reports.

On February 14, 2005, the Bank executed the Stipulation and Ratification of Oil and Gas Lease ("the Ratification") tendered by the Rutherfords. The Ratification provides, in pertinent part:

1. Each of the Baker Trusts and each of the Rutherfords (collectively, the "Mineral Owners") hereby stipulates and agrees that (a) the Lease is currently in full force and effect and (b) the term of the Lease has been continuously perpetuated since April 23, 1971, by either (i) the production of oil and/or gas in paying quantities or (ii) operations, or both.

2. Without limiting the foregoing, (a) each of the Baker Trusts hereby (i) ratifies and adopts the Lease insofar as it covers or applies to the Leased Premises and (ii) grants and leases the Leased Premises to the Lessees upon the terms and provisions set forth in the Lease, and (b) each of the Rutherfords hereby (i) ratifies and adopts the Lease insofar as it covers or applies to Survey 3 and (iii) grants and leases Survey 3 to the Lessees upon the terms and provisions set forth in the Lease.

3. Each of the Mineral Owners hereby waives and releases any and all claims that the Lease terminated prior to the date of execution of this instrument for any reason whatsoever.

After the Bank signed the Ratification, Hoskins amended its petition and named the Bank as a defendant.[34] It was during the course of discovery proceedings related to that lawsuit that the Bank learned that the Leases and the JOA actually had terminated in 2001, that the representations on which it relied in signing the Ratification were false, and that Prize and the Rutherfords knew those representations were false. Hoskins nonsuited its claims against the Bank, and the Bank asserted affirmative claims against Prize and the Rutherfords, including a request for a declaration that the Baker Lease terminated in August 2001. The Bank also sought rescission of the Ratification on grounds including fraudulent inducement, mutual mistake, and failure of consideration.

With respect to the fraudulent inducement claim, the Bank alleged that Prize and the Rutherfords made the following misrepresentations:

(1) the Baker Lease did not terminate; (2) the Baker No. 6 Well was flared on June 15, 16, and 17, 2001; (3) flaring of the Baker No. 6 Well in June 2001 constituted production for purposes of the 60-day cessation of production clause in the Baker Lease; (4) there was no cessation of production for a period exceeding 60 days; (5) the Leased Property was at risk of substantial drainage if the Bank did not sign the Ratification; and (6) signing the Ratification would protect the Bank from the risk of drainage.

---

[34] Burlington signed a similar ratification document concerning the El Paso Lease.

The Bank also alleged that Prize and the Rutherfords failed to disclose that:

> (1) Prize's own internal documents show that no venting or flaring of the Baker No. 6 Well occurred in June 2001 and that there was a cessation of production for a period exceeding 60 days in the summer of 2001; (2) royalties paid in December 2001 for June 2001 were not based on actual gas sales but were based on gas that was purportedly vented into the atmosphere; and (3) taxes paid in 2002 for gas allegedly produced in June 2001 were not based on gas sales but were based on the alleged venting operation.

The Bank alleged that these misrepresentations and concealments were material, made with knowledge of their falsity, or asserted recklessly without knowledge of the truth, were intended to be relied upon and were relied upon by the Bank to its detriment.

Thereafter, Prize and the Rutherfords jointly filed a traditional and no-evidence motion for summary judgment as to all causes of action asserted against them by Hoskins, BP, the Bank, and Burlington. In the motion, they contend the Bank's claims are precluded by the Ratification. Further, the Bank's claim that the Ratification was fraudulently induced fails because the alleged misrepresentations concerning flaring and production were neither material or justifiably relied upon by the Bank as a matter of law.

The Bank filed separate responses to the no-evidence and traditional summary judgment motion, to which Prize and the Rutherfords filed a joint reply. In its interlocutory judgment dated February 5, 2009, the trial court granted Prize's and the Rutherfords' motion for summary judgment on all claims by the Bank, including its claims of fraud and rescission of the Ratification. The court ordered that the Bank take nothing on its claims against Prize and the Rutherfords. The trial court's final judgment incorporated the interlocutory judgment and taxed Prize's and the Rutherfords' costs against the Bank; the Bank was also ordered to bear its own costs. The Bank timely filed its notice of cross-appeal.

**(2) Summary of the Bank's Argument.** The Bank asserts the record and the trial court's rulings establish that the basis for granting summary judgment against the Bank was the trial court's enforcement of the Ratification and its denial, as a matter of law, of the Bank's claim that the Ratification was fraudulently induced. On appeal, the Bank contends the trial court erred in granting a take-nothing summary judgment on all of its affirmative claims because: (1) Prize's and the Rutherfords' motion did not challenge each asserted ground for fraudulent inducement; (2) Prize and the Rutherfords did not conclusively establish that the entire Ratification was not vitiated by fraud; (3) Prize and the Rutherfords did not conclusively establish that their misrepresentations concerning flaring and cessation of production were not material and that the Bank did not justifiably rely on them; (4) the Bank raised a genuine issue of material fact on each challenged element of the Bank's claim for fraudulent inducement; and (5) the Bank raised a genuine issue of material fact concerning Prize's and the Rutherfords' liability for trespass.[35] Additionally, the Bank contends the trial court abused its discretion in allocating all of Prize's and the Rutherfords' court costs to the Bank.

**(3) Fraudulent Inducement.** On appeal, the Bank complains the trial court erred in granting the defendants' motion for summary judgment on the Bank's claim for fraudulent inducement. We review the summary judgment under the standard of review previously articulated. Fraudulent inducement is a type of fraud claim that requires a showing that a false material misrepresentation was made that (1) was either known to be false when made or was asserted without knowledge of the truth, (2) was intended to be relied upon, (3) was relied upon, and (4) caused injury. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998); *Am. Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 436 (Tex.

---

[35] The Bank adopts the briefing by Hoskins on the issue of trespass and we previously addressed and overruled that issue in the section on trespass.

1997). "Failing to disclose information is equivalent to a false representation only when particular circumstances impose a duty on a party to speak, and the party deliberately remains silent." *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 678 (Tex. 2009) (orig. proceeding) (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)).

In their traditional motion for summary judgment, Prize and the Rutherfords did not contest that their representations to the Bank were false, that they were known to be false when made or were made without knowledge of their truth, that they intended for the Bank to rely upon them, or that the Bank's reliance caused it injury, nor did they contend that they did not have a duty to speak. Thus, for summary judgment purposes, these elements of fraudulent inducement are not in dispute. Prize and the Rutherfords moved for summary judgment on the Bank's claim for fraudulent inducement on the grounds that, as a matter of law: (1) any misrepresentation concerning flaring is not material and could not have been justifiably relied upon because the Bank does not believe that flaring constitutes production; (2) any misrepresentation that the Baker Lease had not expired due to a cessation of production for more than sixty days is not material and could not have been justifiably relied upon because the Lease could also have expired for failure to produce in paying quantities; and (3) the Bank not only ratified the Baker Lease, but also entered into a new lease. We address each ground in turn.

### A. Misrepresentations and Omissions Regarding Flaring

The Bank first contends Prize and the Rutherfords did not conclusively establish that their misrepresentations and omissions concerning flaring were not material or that the Bank did not justifiably rely on them. We agree.

*Materiality*

A representation is "material" if "a reasonable person would attach importance to [it] and would be induced to act on [it] in determining his choice of actions in the transaction in question." *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 478-79 (Tex. App.—Forth Worth 2004, no pet.). Here, before signing the Ratification, Prize and the Rutherfords represented to the Bank that flaring occurred on the Baker Well No. 6 in June 2001; Prize and the Rutherfords now concede this statement was false.[36] Prize and the Rutherfords, however, contend this misrepresentation is immaterial because the Bank did not believe that flaring constitutes production. In support, Prize and the Rutherfords point to the deposition testimony of Anthony Gatti, Burlington's corporate representative, and Peter Huddleston, plaintiffs'[37] retained expert, as well as the Bank's admission number 37.[38] However, the testimony of Burlington's corporate representative is no evidence of a belief held by a different entity, the Bank. Additionally, although Huddleston opined that flaring is not production, there is no evidence that he conveyed his opinion to the Bank at or before the time the Ratification was signed; in fact, the record reflects that the Bank did not become his client until it "joined the proceeding," which was well after the Ratification was signed.

Finally, admission number 37 merely establishes that it is the Bank's *present* belief that flaring does not constitute production. A party's knowledge of falsity before or at the time of reliance is the only relevant inquiry in a fraud claim; knowledge gained after the fact cannot

---

[36] As previously noted, in their motion for summary judgment, the Rutherfords and Prize conceded that "[f]or purposes of summary judgment, the court may assume there was no flaring" on the Baker No. 6 Well from June 2, 2001 through August 11, 2001; thus, it is established for summary judgment purposes that there was a cessation of production for a period exceeding sixty consecutive days; it is also established for summary judgment purposes that the Baker Lease terminated in August 2001.

[37] Huddleston stated he was initially hired by BP, but also worked for Hoskins, Burlington, and the Bank.

[38] In response to request for admission No. 37, the Bank admitted that flaring does not constitute "production" for purposes of the 60-day cessation of production clause in the Baker Lease.

vitiate the fraud. *Pankow v. Colonial Life Ins. Co. of Tex.*, 932 S.W.2d 271, 277 n.6 (Tex. App.—Amarillo 1996, writ denied). The summary judgment record raises a fact issue that at the time the Bank signed the Ratification, it relied on the written materials provided by Prize and the Rutherfords which indicated that flaring is considered production sufficient to hold the Baker Lease. Specifically, Mike Rutherford's letter to Judge stated that the Baker Well No. 6 "produced gas for a 3-day period in June (June 15th through 17th)" 2001 and again in mid-August; "thus, there was no cessation of production for more than sixty consecutive days, as alleged in the Demand Letter." This assertion is based on the production data, which shows "flaring to tank" for the three days in question. Thus, Prize and the Rutherfords represented that flaring constituted production sufficient to hold the Baker Lease. Both Judge and Anderson testified that the Bank decided to sign the Ratification based on Rutherford's assurance that the Lease had not terminated; this assurance was based on the production data showing that there had been no cessation of production (due to flaring). Hence, the misrepresentation regarding flaring was material because it induced the Bank to sign the Ratification. *See Citizens Nat'l Bank*, 142 S.W.3d at 478-79.

### *Reliance*

Further, we cannot conclude that Prize and the Rutherfords established as a matter of law that the Bank did not justifiably rely on the misrepresentations and omissions regarding flaring. The issue of justifiable reliance is generally a question of fact. *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). Judge testified the Bank felt that the Baker Lease had not terminated because the P-2s and gauge reports provided by Prize and the Rutherfords did not show a cessation of production for more than sixty consecutive days and because the Bank had been consistently

receiving revenues. She stated that had the Bank known the Baker Lease had terminated, it would have renegotiated a lease with a higher royalty. Viewing the facts in the light most favorable to the Bank, we conclude this evidence raises a fact issue regarding the Bank's reliance on the misrepresentations made by Prize and the Rutherfords.

### B.  Misrepresentations and Omissions Regarding Cessation of Production

Next, the Bank contends Prize and the Rutherfords did not conclusively establish that their statements and omissions concerning cessation of production were not material or that the Bank did not justifiably rely upon them.

#### Materiality

Materiality is determined by examining whether a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question. *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*,  No. 14-09-00528-CV, 2010 WL 4467534, at *5 (Tex. App.—Houston [14th Dist.] Nov. 9, 2010, pet. filed); *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App.—Houston [14th Dist.] 1991, no writ). "In the context of fraudulent inducement, it is well established that a 'representation is material if it induces a party to enter a contract.'" *Reservoir Sys.*, 2010 WL 4467534, at *5 (quoting *Brush v. Reata Oil & Gas Corp.*, 984 S.W.2d 720, 727 (Tex. App.—Waco 1998, pet. denied)). "Even if a misrepresentation is not a party's sole inducement for entering into the contract, it may still be material so long as the party relied on it." *Reservoir Sys.*, 2010 WL 4467534, at *5.

 In their motion for summary judgment, Prize and the Rutherfords claimed that their misrepresentations regarding cessation of production were not material because (1) the Bank was

aware of a claim that the Baker Lease had expired for failure to produce in paying quantities, and (2) Prize and the Rutherfords made no misrepresentation concerning the paying quantities issue.

First, although the Bank was aware of the claim regarding paying quantities contained in Hoskins' demand letter, it was not the focus of Rutherford's letter to Judge; rather, cessation of production in excess of sixty days is the express reason Rutherford cites for Hoskins' conclusion that the Baker Lease expired. As previously discussed, however, Prize and the Rutherfords assured the Bank that there was no validity to the cessation of production allegation, and therefore induced the Bank to sign the Ratification. Clearly then, the misrepresentation regarding cessation of production, regardless of the Bank's knowledge of the paying quantities claim, was material. *See Citizens Nat'l Bank*, 142 S.W.3d at 478-79 (representation is material if a reasonable person would be induced to act on it in determining his choice of actions).

Second, we disagree that the summary judgment evidence establishes that Prize and the Rutherfords did not make a misrepresentation regarding the paying quantities issue. Jack Chenowith testified that when the Rutherfords asked the Bank to sign the Ratification, they represented to the Bank that the Leases had not terminated. Such a blanket statement implicitly indicates the Baker Lease did not terminate for any reason, including for failure to produce in paying quantities. Additionally, the record contains evidence that Rutherford did not tell the Bank that Prize paid royalty and working interest owners for gas that was falsely reported. Thus, there is summary judgment evidence raising a fact issue that Prize and the Rutherfords concealed that the Lease had terminated, both for cessation of production and for failure to produce in paying quantities. Accordingly, we cannot conclude Prize and the Rutherfords established that their misrepresentations regarding cessation of production were not material as a matter of law. *See Brush*, 984 S.W.2d at 727.

*Reliance*

Moreover, we cannot conclude Prize and the Rutherfords conclusively established that the Bank did not justifiably rely on their misrepresentations and omissions regarding cessation of production. Although Prize and the Rutherfords contend that the Bank failed to investigate whether the Baker Lease terminated for failure to produce in paying quantifies, the Bank was justified in relying on Prize's and the Rutherfords' statements that the Lease had not terminated. Prize and the Rutherfords were the operators and had superior access to the necessary production and expense information. As Anderson testified, the Bank had no reason to disbelieve the representation that the Baker Lease produced in paying quantities because the Rutherfords, not the Bank, were the ones with access to such information. Again, justifiable reliance is generally a question of fact. *1001 McKinney*, 192 S.W.3d at 30. We therefore hold that based on this record, Prize and the Rutherfords failed to establish that the Bank did not justifiably rely on Prize's and the Rutherfords' misrepresentations and omissions as a matter of law.

**(4) Fact versus non-actionable opinion.** Prize and the Rutherfords attempt to justify the summary judgment granted in their favor on the ground that they made only statements of opinion. They portray the Bank's fraudulent inducement claim as based on two representations made by Mike Rutherford, both of which are non-actionable opinions: (1) that Prize and the Rutherfords would ultimately prevail in litigation by establishing Hoskins' claims were meritless, and (2) that abandonment of drilling could expose the property to drainage by others.[39]

---

[39] In their briefing, Prize and the Rutherfords also assert there is no evidence they represented that the property subject to the Baker Lease would risk substantial drainage if the Ratification was not signed. Therefore, they argue the trial court properly dismissed this fraud claim. We disagree. The essence of the Bank's claim regarding the drainage statement is that Prize and the Rutherfords used that statement to wrongly induce the Bank to quickly sign the Ratification. In that regard, the summary judgment evidence raises a fact question as to whether Prize and the Rutherfords made this statement, while concealing the fact that the Baker Lease had terminated due to non-production, in order to avoid the consequences of the terminating old lease and to prevent the Bank from negotiating a new, more favorable lease. Accordingly, the trial court erred in granting summary judgment on the Bank's fraud

We disagree with Prize's and the Rutherfords' attempt to recast and limit the Bank's fraud claim and their characterization of the statements at issue as mere opinion. As their pleadings and summary judgment evidence reflect, the Bank alleged and presented evidence of more than two misrepresentations and concealments of material fact. Furthermore, the Bank alleged Prize and the Rutherfords made numerous discrete statements of fact. For example, the statement that the Baker Well No. 6 "produced gas for a 3-day period in June" is an affirmative and discrete statement of fact, not an opinion, which Prize and the Rutherfords now concede was false. *See Marshall*, 288 S.W.3d at 444 (statements concerning continuous operations and no cessation of operations for more than 60 days were factual representations, not mere opinions). Finally, even statements of opinion are actionable if the opinion is "based on or buttressed with false facts," if the speaker knows the statement is false, or if the speaker purports to have special knowledge of the facts or actually has superior knowledge of the facts. *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 277 (Tex. 1995). Here, the summary judgment evidence raises a fact question sufficient to defeat summary judgment that Prize and the Rutherfords, as the working interest owners of the wells in question, made false statements of fact to the Bank. *See id.* at 276 ("Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made.").

**(5) New Lease.** Prize and the Rutherfords also moved for summary judgment on the basis that even if the Ratification was procured by fraud, the Bank's fraudulent inducement claim must fail because the Ratification revived the Baker Lease. Prize and the Rutherfords contended that paragraph 2(a)(ii) of the Ratification re-leased the property by providing that each of Burlington, the Baker Trusts, and the Rutherfords additionally "grants and leases the Leased

---

claim as it relates to the drainage representation. *See Grinnell*, 951 S.W.2d at 425 (summary judgment improperly granted when genuine issue of material fact exists).

Premises to Lessees upon the terms and conditions set forth in the [original] Lease. . . . ”  Prize and the Rutherfords assert that this “granting” language created new or renewal leases with the same terms and conditions as the original leases, in the event the old leases had expired.  We reject this argument.  Fraud as to the Ratification vitiates the entire agreement.  “[Texas] courts have consistently held that fraud vitiates whatever it touches. . . .”  *Stonecipher’s Estate v. Butts’ Estate*, 591 S.W.2d 806, 809 (Tex. 1979).  As discussed above, there is evidence in this summary judgment record showing that the Bank would not have signed the Ratification as a whole but for the material misrepresentations made by Prize and the Rutherfords and justifiably relied upon by the Bank.  As Judge testified, had the Bank known the Baker Lease had terminated, it would not have signed the Ratification, but instead would have attempted to renegotiate a higher royalty.  Therefore, we conclude the mere fact that the Ratification contains renewal or revivor language does not establish as a matter of law that the Bank was not induced to execute the Ratification by Prize’s and the Rutherfords’ misrepresentations that the Baker Lease had not expired.

**(6) Ratification and Waiver.**  Finally, in their briefing, Prize and the Rutherfords also argue the Bank performed under the Ratification by signing division orders in 2006 and allowing Prize and the Rutherfords to drill under the Baker Lease, thereby ratifying the agreement and waiving any right to assert fraud as a ground to avoid or rescind the Ratification.  However, these contentions were not raised as grounds in the motion for summary judgment.  TEX. R. CIV. P. 166a(c) (motion for summary judgment must “state the specific grounds therefor” and the issues must be “expressly set out in the motion”); *Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex. 1993) (summary judgment cannot be affirmed on grounds not expressly presented in the summary judgment motion, answer, or other response).  Accordingly, we decline to consider these contentions as a basis for affirming the summary judgment.

Based on the foregoing, we sustain the Bank's first issue on cross-appeal, and reverse the granting of summary judgment on its claim for fraudulent inducement. Because enforcement of the Ratification was central to all of the Bank's claims for affirmative relief, we also reverse the summary judgment granted on the Bank's remaining claims for affirmative relief, and remand the cause to the trial court for further proceedings.[40]

## II. Assessment of Costs

We additionally sustain the Bank's second issue on cross-appeal because we agree that the trial court erred in allocating all of Prize's and the Rutherfords' costs of court to the Bank. Rule 131 of the Texas Rules of Civil Procedure provides that, "[t]he successful party to a suit shall recover of his adversary all costs incurred therein, except where otherwise provided." TEX. R. CIV. P. 131. Rule 141 further provides that "the [c]ourt may, for good cause, to be stated on the record, adjudge the costs otherwise than as provided by law or these rules." TEX. R. CIV. P. 141. A "successful party" is "one who obtains a judgment of a competent court of jurisdiction vindicating a civil claim of right." *Moore v. Trevino*, 94 S.W.3d 723, 729 (Tex. App.—San Antonio 2002, pet. denied).

While the trial court denied all of the Bank's claims against Prize and the Rutherfords by summary judgment based on its enforcement of the Ratification, the court also denied Prize's and the Rutherfords' counterclaims against the Bank. Despite the fact that both parties were partially successful, the trial court assessed all of Prize's and the Rutherfords' costs against the Bank without stating on the record the reason for doing so. We conclude such an assessment was contrary to Rules 131 and 141. Because the trial court abused its discretion in assessing all costs against the Bank, *San Antonio Housing Auth. v. Underwood*, 782 S.W.2d 25, 27 (Tex.

---

[40] Prize and the Rutherfords argue that the Bank must choose between rescission of the Ratification and damages for fraud. *See Foley v. Parlier*, 68 S.W.3d 870, 882 (Tex. App.—Fort Worth 2002, no pet.). Such an election, however, is not proper at this time, and will be determined in the trial court.

App.—San Antonio 1989, no writ) (assessment of court costs is a matter within the sound discretion of the trial court), we reverse the portion of the judgment assessing costs against the Bank, and remand the issue of those court costs to the trial court for reconsideration.

CONCLUSION

Based on the foregoing analysis, we conclude the trial court's judgment should be affirmed in part, modified and affirmed in part, reversed and rendered in part, and reversed and remanded in part, as follows:

1. We affirm the portion of the trial court's judgment rendering declaratory relief on the question of title;

2. We affirm the trial court's grant of summary judgment in favor of Prize and the Rutherfords on the claims of trespass;

3. We affirm the trial court's calculation and award of damages to Hoskins and BP, with the following exceptions:

(a) we sustain BP's issue on cross-appeal challenging the in-kind payment and modify the judgment to strike the last sentence of the last substantive paragraph of the judgment permitting Prize and the Rutherfords to satisfy their obligations to account to Hoskins and BP "by tendering their applicable share of gas in kind at the wellhead in lieu of payment;"

(b) we sustain the Rutherford Children's issue challenging their liability for damages, and modify the judgment to reflect that the damages award is not assessed against the Rutherford Children; and

(c) we sustain the Rutherfords' issue on joint and several liability, and modify the judgment to delete the imposition of joint and several liability among all the defendants;

4.  We hold the trial court did not abuse its discretion in denying attorneys' fees to the parties, except that we sustain Hoskins' and BP's issue on cross-appeal and hold the court erred in denying their request for attorneys' fees and judgment is rendered that both Hoskins and BP each recover $900,000 in attorneys' fees;

5.  We hold the trial court abused its discretion in awarding pre-judgment interest on the damages award, and modify the judgment to delete the assessment of pre-judgment interest;

6.  We affirm the trial court's imposition of $200,000 in sanctions against Hoskins; and

7.  We reverse the trial court's grant of summary judgment on all the Bank's claims, and reverse the assessment of costs against the Bank, and remand to the trial court for further proceedings on the Bank's claims.  In all other respects, the trial court's judgment is affirmed.

Phylis J. Speedlin, Justice